## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION[1]

*Filed Electronically*

IN RE:

| | | |
|---|---|---|
| | ⋮ | |
| Ricky Baldwin & Lorie Jean Baldwin | ⋮ | CASE NUMBERS: 20-10009 (7) |
| Melissa Ann Maddox | ⋮ | 20-10037 (7) |
| Jimmy Michael Lawhorn | ⋮ | 20-10048 (7) |
| Aaron Deon Hadley & Emily Belle Hadley | ⋮ | 20-10068 (7) |
| Darrell Wayne Ollery & Donna Kay Ollery | ⋮ | 20-10084 (7) |
| Sheila Joan Carlton | ⋮ | 20-10088 (7) |
| Gregory Ryan Baldock | ⋮ | 20-10158 (7) |
| Stephen Allen Thomas | ⋮ | 20-10207 (7) |
| Robert Lloyd Ray & Sheila Lois Ray | ⋮ | 20-10211 (7) |
| Marilyn L. Janes | ⋮ | 20-10225 (7) |
| Heather Renee Hutchins | ⋮ | 20-30066 (7) |

DEBTORS

**MEMORANDUM OF THE UNITED STATES TRUSTEE IN COMPLIANCE WITH
AMENDED *SUA SPONTE* ORDER OF THE COURT**

Paul A. Randolph, Acting U.S. Trustee for Region 8 (the "U.S. Trustee"), files

this Memorandum in compliance with the *Amended Sua Sponte Order* entered by

this Court on September 3, 2020 in the above numbered, and styled, cases. In

support of his memorandum, the U.S. Trustee states as follows:

OVERVIEW

In each of the eleven cases that comprise this matter, the question before this

Court is whether, and under what circumstances, it is permissible for an attorney to

bifurcate their Chapter 7 work into pre-, and post-, petition services (a "bifurcated

agreement") to collect their attorney's fee post-petition.  These debtors are

---

[1] All but Heather Renee Hutchins  20-30066 were field in the Bowling Green Division

consumers with uncomplicated cases who sought legal representation to assist them in attaining bankruptcy relief.  Generally Attorney Michael Harris ("Harris") offered the debtors two options: (i) pay $1,650 prior to the inception of the case to cover the entire cost of the bankruptcy; or (ii) pay $2,500 over the course of a year, in monthly allotments of approximately $200 (the "Post-Petition Fee"). The debtors, who are uniformly in difficult financial circumstances, chose the Post-Petition Fee and signed two contracts with Harris typically on the day that he filed their petitions. Despite charging these debtors a premium of $850 over the amount of his standard fee, Harris did not provide them with any additional services. Instead, the entire increase in the Post-Petition Fee is derived from Harris' relationship with Fresh Start Funding, LLC ("FSF"), a company that provides financing to law firms with certain consumer-focused practices.

This general practice as the United States Trustee understands it and as implemented in the relevant cases, is problematic for numerus reasons, including because (i) of the insufficiency of disclosures both to the debtors and to this Court, (ii) of the generally unreasonableness of the fees being charged, (iii) the process used fails to full consider the best interest of the individual debtors and .(iv) the procedures used to implement the agreements fails to adequately protect the clients interest. Accordingly, the Court should cancel Harris' agreements with these debtors and order Harris to return a portion of the fees to the debtors.

FACTS

I.  <u>PROCEDURAL FACTS</u>

On April 3, 2020, in the eleven chapter 7 cases that comprise this matter [2], this Court entered an *Order of the Court to Set a Show Cause hearing regarding post-petition fees paid or owing to debtor's counsel, at which time the attorney for the debtor shall show cause for failure to disclose the post-petition balance due at the time of the filing of the Disclosure of Compensation of Attorney in compliance with 11 USC Section 329 and Fed.R.Bank.P. 2016* (the "<u>Show Cause Order" or "SCO</u>"). Pursuant to the SCO the hearing to show cause was set for May 21, 2020. During this period, the pandemic brought on by Covid-19 caused a disruption in the Court's ability to conduct in-person hearings. As such, on May 7, 2020, this Court continued the hearing to show cause to July 23, 2020. Subsequently, on July 7, 2020, the Court rescheduled the hearing to July 29, 2020, as a telephonic hearing.

On July 28, 2020, Harris filed a Response to the SCO (the "<u>Omnibus Response</u>") in each of these cases. In the Omnibus Response, Harris asserted that his Forms 2030 were accurate because "the narrative contained in paragraph 7 of each Disclosure not only describes the engagement structure but also divulges the

---

[2] Baldwin 20-10009 Docket Entry Number 12; Maddox 20-10037 Docket Entry Number 16; Lawhorn 20-10048 Docket Entry Number 111; Hadley 20-10068 Docket Entry Number 13; Carlton 20-10088 Docket Entry Number 12; Ollery 20-10084 Docket Entry Number 18; Baldock 20-10158 Docket Entry Number 13; Ray 20-10211 Docket Entry Number 15; Thomas 20-10207 Docket Entry Number 13; Janes 20-10225 Docket Entry Number 15;Hutchins 20-30006  Docket Entry Number 13.

balance of post-petition fees due at the time of the filing of such Disclosure."
*Omnibus Response* at 1-2.

On July 29, 2020, this Court held the show cause hearing and considered statements of Harris as well as the undersigned as representative of the U.S. Trustee. Thereafter, on August 6, 2020, this Court entered an Order requiring Harris to file his contracts and fee agreements with the debtors as well as documents related to his line of credit with FSF (the "Document Order") in the docket of each of these cases.

On August 17, 2020, Harris complied with the Document Order by filing his contracts with both the debtors and FSF in each case. Subsequently, on September 9, 2020, this Court entered an Order requiring the U.S. Trustee to review Harris' contracts and file a memorandum regarding the ethical obligations imposed upon an attorney representing a debtor under Chapter 7.

The U.S. Trustee, with the consent of Harris, conducted examinations of each of the debtors in this matter. The purpose of these examinations was to allow the U.S. Trustee to gather facts about both Harris' procedures and the debtors' cases.

## I.    Harris' Relationship with Fresh Start

Harris is an attorney licensed in Kentucky and practicing with the firm of Harris and Harris, PSC in Columbia, Kentucky. Harris' practice includes the representation of consumer debtors in Chapter 7 and 13 cases in the Bowling Green Division of the Western District of Kentucky. FSF is an Arizona company that

provides financing and various other services to law firms that represent consumer clients.

In August of 2019, Harris and FSF entered into a Line of Credit and Accounts Receivable Management Agreement ("LOCARMA"). Under the terms of the LOCARMA, FSF provides a $50,000 line of credit to Harris in exchange for a lien on, and right to collect, his accounts receivable. The process for Harris to include a client in the LOCARMA is as follows:

1. Harris engages a client using a bifurcated fee agreement which allows for collection of fees after the filing of the petition.

2. Harris uploads the client contract to FSF's online database.

3. FSF reviews the client contract for compliance with its underwriting requirements and, if the client contract meets these requirements, it becomes an Approved Account ("Approved Accounts").

4. After the client contract becomes an Approved Account, FSF has three business days to make an advance to Harris of 60 percent of the entire fee charged to the client ("Initial Amount").

5. Contemporaneously, FSF retains 15 percent of the entire fee charged to Harris' client (the "Holdback Amount") "as security for the performance of all Approved Accounts funded by FSF" under the terms of the LOCARMA;

6. The remaining 25 percent of the fee is retained by FSF as compensation for its services.

In order to operate as designed, the LOCARMA is dependent on FSF's ability to collect fees from Harris' debtor-clients post-petition. As such, the prefatory stipulations contained in the LOCARMA state that Harris' clients enter "into a post-petition fee agreement…with the Firm to pay a fixed fee for the post-petition chapter 7 services." Accordingly, the use of a bifurcated agreement is a requirement of Harris' ability to participate in the LOCARMA and access the line of credit.

The LOCARMA aggregates the Holdback Amount from each of Harris' clients into a single account (the "Holdback Account"). This Holdback Account then functions as an insurance policy "for the performance of all Approved Accounts funded by FSF" under the LOCARMA.

The LOCARMA requires Harris to disclose the existence of the LOCARMA to his clients, answer any questions about the agreement, and attain, in writing, the client's consent to the assignment of their account as an Approved Account. The LOCARMA also contains the following requirements for Harris:

1) His clients consent in writing to the disclosure of their personal information the FSF requires o collect the accounts receivable.
2) His clients consent to FSF contacting them by email, telephone, text message, and regular mail.
3) He utilizes a contract that contains disclosure language substantially similar to the language FSF provided as its best practices.
4) He discloses the bifurcation of fees and collateral assignment on his Form 2030 in a manner that comports with FSF's recommended best practices.
5) He will pay the filing fee promptly if the client does not pay it in advance and FSF has allocated the Initial Amount to Harris.
6) His clients are fully informed, and received an opportunity to seek legal advice, regarding consent and waivers of conflicts of interest; and
7) His clients enter into a payment authorization form.

The remainder of the LOCARMA then[3]: (i) allocates the responsibility over management and collection of all Approved Accounts to FSF while setting the terms for collection of those accounts; (ii) guarantees that FSF will defend Harris against any challenges brought in relation to the LOCARMA; and (iii) grants a first security interest to FSF in Harris' accounts receivable.

---

[3] The LOCARMA has additional terms not summarized herein which, the U.S. Trustee believes, do not impact the issues before this Court.

The collection terms in the LOCARMA allows FSF to "manage and collect the payments -under the Approved Accounts" which includes the authority to "modify payment terms, defer payments and take other steps as reasonably necessary to resolve delinquencies and defaults by Clients under the Approved Accounts." However, the LOCARMA states that, in the event of a default FSF will first offset unpaid amounts against the Holdback Account. In fact, FSF will demand payment from Harris only if the Holdback Account does not contain sufficient funds to cover a default by one of his client's Approved Accounts. Further, the LOCARMA states that FSF will not file a collection lawsuit against Harris clients unless: (i) Harris is in default under the LOCARMA; (ii) the Holdback Account does not contain sufficient funds to cover any defaults of Approved Accounts; and (iii) Harris has withdrawn from, or completed, representation of the client at issue. None of these provisions related to collection are contained in the contract between Harris and his clients.

## II.  **Harris' General Engagement Practice**

After a prospective client contacts Harris, he holds a meeting with the client to discuss their financial issues, bankruptcy options, and the process for filing a bankruptcy case.  According to Harris, during this first meeting he explains to each of his prospective clients that their options for paying his fees are as follows:

1) prior to filing a petition for bankruptcy relief, the client can pay Harris' entire fee of $1650; or

2) Harris will file a petition for the client immediately in exchange for the client signing two contracts and agreeing to pay $2500 over 12 months post-petition: or

3) file a Chapter 13 petition and pay approximately $3,750 in attorney fees over the first year of the plan. [4]

Generally, a prospective client leaves Harris' office with a list of items Harris needs to prepare a petition in bankruptcy.  Either during the initial meeting or at a second meeting the following generally occurs.

1) Harris and the Debtor execute a detailed "Prepetition Agreement" which, in relevant part, states that:

    a. The client has the two payment options described herein above.

    b. Harris agrees to provide limited pre-petition services to the debtor including: 1) analysis of information provided by the debtor to Harris; 2) performance of certain due diligence, and 3) preparation, and filing, of a petition, a social security number statement, a credit counseling certificate and list of creditors (hereinafter referred to as the "<u>Skeletal Petition</u>").

    c. Harris agrees to advance the client the required filing fee of $335.

    d. The client agrees to compensate Harris for his pre-petition work in a stated amount, which is typically "$0.00";

    e. unless the Debtor executes a second "Post-Petition Agreement", Harris will not be obligated to perform any additional services besides the above  limited "pre-petition" services; and

    f. If the client decides to select Harris as their post-petition attorney, he will charge them $2,500 for the following services:

- Preparing and filing of a Statement of Financial Affair and Schedules.
- preparing and filing of a Means Test calculations and disclosures.
- Conducting a second signing appointment to review and sign the statements and schedules.

---

[4] Harris indicated that this $3,750 sum was the amount of fees he had most recently been approved to receive in a Chapter 13 proceeding in this District.

- Noticing the client's employer with a [Stop Notice Action] to stop any garnishment.
- Preparing for and attending the client's Section 341 Meeting of Creditors.
- Attending any continued Section 341 Meeting of Creditors.
- Reviewing and advising for any motions for stay relief.
- Reviewing and advising for any redemption agreements.
- Reviewing and advising for any reaffirmation agreements and attending any hearings.
- Representing in connection with any 2004 exams.
- Drafting and filing motions to reinstate the case.
- Administrating and monitoring the case.
- Reviewing and responding to Trustee requests.
- Forwarding the Trustee Questionnaire and Debtor documents to the Trustee.
- Preparing and filing motions to reopen (if necessary); and
- Reviewing and advising regarding any creditor violations_.

2) Harris prepares and files the Skeletal Petition on behalf of the client.

3) After the Skeletal Petition has been filed, Harris and the Client sign a "Post-Petition Fee Agreement which, in relevant part states that:

    a.  the Debtor agrees to pay Harris $2,500 over 12 months on a weekly, bi-weekly or monthly basis.

    b.  the debtor-client will be required to make the installment payments to FSF by direct deduct from debtor-client's bank account, and

    c.  certain inherent conflicts in interest exist as a result of the general terms of the contractual relationship between Harris and the debtor-client which, by the debtor-client's signature on the agreement, are being waived. The agreement proceeds to =advise that the debtor-client can and should seek separate legal advice regarding such conflicts and waivers.

## III Facts of Each Debtor's Case

1) <u>Sheila Carlton Chapter 7 case numbered 20-10088</u>

On January 22, 2020 Ms. Carlton had an initial meeting with Harris. Thereafter, on January 27, 2020, at approximately 5:03 PM CST, Harris and Ms. Carlton signed the "Pre-Petition Agreement". In this agreement, Ms. Carlton agreed to pay nothing for Harris' pre-petition services which included advancing the filing fee on her behalf. This agreement also details Harris total post-petition attorney's fee of $2100, the terms of payment for that fee post-petition, and the legal services which Harris will provide upon retention post-petition.

One day later, on January 28, 2020, at approximately 11:18 EST Harris filed Ms. Carlton's Skeletal Petition. On that same day, at 10:29 AM CST Harris and Ms. Carlton executed a "Post-Petition Service Agreement" which provided in part that Ms. Carlton would pay $2,100 to Harris in monthly payments of $175 beginning February 21, 2020. Ms. Carlton also executed a payment authorization form authorization of the automatic withdrawal of her scheduled payments when due post-petition.

On February 5, 2020, Harris filed the remaining documents and schedules on Ms. Carlton's behalf. These documents disclosed in part:

a) Ms. Carlton had $5,325 in total unsecured debt, and
b) her household net monthly income of $1,592 with total monthly expenses of $1,580. Her net monthly income was $12
c) An agreement to pay $2,500 in attorney fees over 12 months.

2) Aaron and Emily Hadley Chapter 7 case numbered 20-10068

On or before January 16, 2020, Mr. and Mrs. Hadley met with Harris to discuss filing for bankruptcy.

On January 23, 2020 at approximately 11:32 AM CST, the Hadleys and Harris signed a Pre-Petition Agreement. This agreement called for the Hadleys to pay nothing for Harris' pre-petition bankruptcy services and for Harris to pay the filing fee. This agreement also details Harris' post-petition attorney fee of $2,500, the terms of payment for those fees ($208.33/month), and the legal services which Harris will provide post-petition for the agreed upon fee. On the same date, at 12:49 EST Harris paid the filing fee and filed the Hadley's Skeletal Petition.  On the same day at 12:04 PM CST  Harris and the Hadleys signed a Post-Petition Agreement. In this Post-Petition agreement, the Hadleys agreed to pay Harris $2,500 in monthly payments of $208 over 12 months beginning February 14, 2020. The Hadleys also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On January 30, 2020 Harris filed the remaining schedules and statements on behalf of the Hadleys which, in relevant part disclosed:

a)  $58,216.62 in total unsecured debt, $5,485 of which was student loans

b)  $3,319.33 in net household monthly income for a family of three people with monthly expenses of $3268.00. The Hadley's reported net monthly income of $51.33 .

### 3) Darrell and Donna Ollery Chapter 7  20-10084

On January 14, 2020 Mr. and Mrs. Ollery met with Harris to discuss filing for bankruptcy relief.

On January 27, 2020, at approximately 4:05 PM CST, the Ollerys executed a Pre-Petition Agreement with Harris.  This agreement called for the Ollerys to pay nothing for Harris' prepetition bankruptcy services and for Harris to advance the

filing fee on their behalf.  This agreement also details the Harris' total post-petition attorney's fee of $2500, the terms of payment for those fees post-petition ($208.33/month), and the legal services which would be covered by the post-petition contract. On the same day, at approximately 5:14 EST, Harris filed the Ollerys' Skeletal Petition.   Also, on the same day, at 4:23 PM CST, Harris and the Ollerys entered into a "Post-Petition Service Agreement."  This Agreement called for the Ollerys to pay Harris $2,500 in 12 monthly payments of $208 beginning February 4, 2020. The Ollerys also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On February 6, 2020 Harris filed the remaining documents and schedules on behalf of the Ollerys.  These schedules and documents reported:

a)      Total unsecured debt for the Debtors of $8,908, and

b)      net monthly household income of $3,055.67 consisting of wages and social security disability payments for a household of two. Their total monthly expenses were $2,960. The Ollerys reported $95.67 in monthly net income.

### 4)  <u>Stephen Thomas Chapter 7 case numbered 20-10207</u>

On January 23, 2020 Mr. Thomas met with Harris to discuss filing for bankruptcy protection due to a wage garnishment. Mr. Thomas had heard Harris' advertisement for a "no money down" bankruptcy.

On March 2, 2020 at 8:56 A.M CST the Mr. Thomas and Harris signed a Pre-Petition Agreement.  This agreement acknowledged that Mr. Thomas paid "580" for Attorney Harris to perform certain prepetition bankruptcy services. This agreement also details Harris' total post-petition attorney fees, the terms of payment for those

fees post-petition ($160/month for 12 months), and the legal services which would be covered by the post-petition contract. On March 2, 2020 at 10:30 am EST Harris filed a Chapter 7 Skeletal Petition on behalf of Mr. Thomas.  On the same day at 9:38 am CST Harris and Mr. Thomas entered into a Post-Petition Service Agreement. This agreement called for Mr. Thomas to pay $1,920 to Harris in 12 monthly payments of $160 beginning April 1, 2020. In addition, Mr. Thomas also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.  .

On March 11, 2020 Harris filed the remaining statements and schedules on behalf of Mr. Thomas.  These documents disclosed

   a)   $41,718.85 in unsecured debt which included $25,873 in student loans, and

   b)   net monthly income of $2,160.70 for a household of one with monthly expenses of $2,089. Thomas reported $71.70 in monthly net income; and

   e)   that Mr. Thomas paid nothing in prepetition attorney's fees and that Mr. Thomas' agreed to pay $2,500 post-petition attorney fees over 12 months.  Mr. Thomas' Statement of Financial Affairs question 16 also states that he had not paid anything during the year prior to filing to anyone he had consulted about bankruptcy.

### 5) Marilyn Janes Chapter 7 case numbered 20-10225

On April 18, 2018 Ms. Janes met with Harris to discuss filing for bankruptcy as the result of accumulating medical debts.  Subsequently, Ms. Janes returned to Harris' office on March 5, 2020 to revisit the idea of seeking bankruptcy relief.

On March 5, 2020 at approximately 3:48 PM CST  Harris and Ms. Janes signed a Pre-Petition Agreement for bankruptcy services. This pre-petition agreement called for Ms. Janes to pay  nothing to Harris for his pre-petition

services while requiring Harris to advance the filing fee on his client's behalf. This pre-petition agreement also details Harris' total post-petition attorney fees of $2,500, the terms of payment for those fees post-petition ($208.33/month), and the legal services encompassed by the prospective post-petition representation. Also, on the same date at approximately 16:57 EST,  Harris filed a Skeletal Petition on behalf of Ms. Janes. On the same day at approximately 4:34 PM CST, Harris and Ms. Janes entered into a Post-Petition Service Agreement which called for Ms. Janes to pay Harris $2,500 in 12 monthly payments of $208 April 3, 2020. Finally, Ms. Janes also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On March 16, 2020 Harris filed the remaining documents, schedules, and statements to complete Ms. Janes' bankruptcy. These documents disclosed:

a)    $22,780.05 in total unsecured debt, and

b)    net monthly income of $1,345.50 with total monthly household expenses of $1,289.00 for a household of one. Ms. Janes reported $56.50 of monthly net income.

**6) Jimmy Lawhorn Chapter 7 case numbered 20-10048**

On January 8, 2020 Mr. Lawhorn met with Harris to discuss filing for bankruptcy protection. Significant medical debt drove Lawhorn to consider bankruptcy relief.

On January 17, 2020 at approximately 2:49 PM CST, Harris and Mr, Lawhorn signed the Pre-Petition Agreement. This agreement called for Mr. Lawhorn to nothing for Harris' pre-petition bankruptcy services while requiring Harris to pay the filing fee on his client's behalf.   This pre-petition agreement also

details Harris' total post-petition attorney fees of $2,500, the terms of payment for those fees post-petition ($96.15/biweekly), and the legal services encompassed by the prospective post-petition representation. Also, on January 17, 2020 at approximately 15:58 EST,  Harris filed a Chapter 7 Skeletal Petition on Lawhorn's behalf. Subsequently on that same day, at approximately 3:02 PM CST, Harris and Mr. Lawhorn entered into a Post-Petition Service Agreement." In this Agreement Mr. Lawhorn agreed to pay Harris total post-petition compensation of $2,500 in biweekly payments of $96.15 over 12 months beginning January 31, 2020. Further, Mr. Lawhorn also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On January 28, 2020 Harris filed the remaining statements and schedules to complete Mr. Lawhorn's bankruptcy.  These documents report:

a)    $35,344.26 in unsecured debt, and

b)    $5,015.84 in net monthly income with total household monthly expenses of $4,895.88 for a household of four. Mr. Lawhorn reported $119.96 in monthly net income.

**7)    Melissa Maddox Chapter 7 case numbered 20-10037**

On January 6, 2020, Ms. Maddox met with Harris to discuss filing for bankruptcy because she had separated from her spouse.

On January 15, 2020 at approximately 10:55 AM CST, Harris and Ms. Maddox signed a Pre-Petition Agreement". This agreement called for Ms. Maddox to pay Harris nothing for his prepetition bankruptcy services while requiring him to advance the cost of the filing fee on behalf of his client. This pre-petition agreement also details Harris' total post-petition attorney's fee of $2,500, the terms of payment

for these fees post-petition ($96.15/biweekly), and the legal services encompassed by the prospective post-petition representation. On January 15, 2020 at 12:36 EST, Harris filed a Chapter 7 Skeletal Petition on behalf of Ms. Maddox. On the same date at 11:42 am CST, Harris and Ms. Maddox entered into the Post-Petition Service Agreement which called for Ms. Maddox to pay Harris $2,500 in biweekly payments of $96.15 over 12 months beginning February 7, 2020. Ms. Maddox . also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On January 23, 2020 Harris filed the remaining schedules and statements to complete Ms. Maddox' bankruptcy. These documents disclosed in part:

a)    $75,321 in total unsecured debt of which $55,169 were student loan obligations

b)    net monthly income of $2,202.68 with $2,703.51 in total monthly expenses for a household of two. Ms. Maddox reported a negative $500.83 in net monthly income.

**8) <u>Ricky and Lorie Baldwin Chapter 7 case numbered 20-10009</u>**

On January 6, 2020 Mr. and Mrs. Baldwin met with Harris to discuss filing for bankruptcy protection. The Baldwins sought bankruptcy protection because Mrs. Baldwin's wages were being garnished.

On January 6, 2020 at approximately 11:58 AM CST, Harris and the Baldwins signed a Pre-Petition Agreement. This agreement called for the Baldwins to pay nothing to Harris for his pre-petition bankruptcy services while requiring him to advance the filing fee on behalf of his clients. This pre-petition agreement also details Harris' total post-petition attorney's fee of $2,500, the terms of payment

for these fees post-petition ($208.33/month), and the legal services encompassed by the prospective post-petition representation. On the same date at 13:13 EST, Harris filed a Skeletal Petition for the Baldwins. Also, on the same date at approximately 12:28 PM CST, Harris and the Baldwins entered into a Post-Petition Service Agreement which called for the Baldwins to pay Harris $2,500 in 12 monthly payments of $208 beginning February 4, 2020. Further, the Baldwins also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On January 16, 2020 Attorney Harris filed the remaining schedules and statements to complete the Baldwins bankruptcy. These documents reported:

a)   $182,781,36 in unsecured debt, of which $69,056 was non-dischargeable student loan debt, and

b)   $2,490.47 in total net monthly income which included $1,982.50 in wages and $1,050 in social security disability income for a household of two people. The Baldwins also reported a total of $2,445 in monthly expenses and net monthly income of $45.47 .

**9)  Heather Hutchins Chapter 7 case numbered 20-30066**

On January 9, 2020 Ms. Hutchins met with Harris to discuss filing for bankruptcy protection. Ms. Hutchins financial problems were partially caused by a separation from her husband.

On January 9, 2020, the same day as the initial meeting, at approximately 9:19 AM CST, Harris and Ms. Hutchins signed a Pre-Petition Agreement. This agreement called for Ms. Hutchins to pay Harris nothing for his pre-petition bankruptcy services while requiring him to advance the filing fee on his client's behalf. This pre-petition agreement also details Harris' total post-petition

attorney's fee of $2,500, the terms of payment for those fees post-petition ($96.15/biweekly), and the legal services encompassed by the prospective post-petition representation. On the same date, at approximately 11:44 EST, Harris filed a Skeletal Petition for Ms. Hutchins. Subsequently, on that same day, at approximately 10:51 AM CST, Harris and Ms. Hutchins signed a Post-Petition Agreement which called for Ms. Hutchins to pay Harris $2,500 in biweekly payments of $96.15 beginning January 31, 2020. Ms. Hutchins  also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On January 21, 2020 Harris filed the remaining schedules and statements to complete Ms. Hutchins bankruptcy.  These documents reported in part:

a)    $32,657.00 in total unsecured debt $17,998.00 of which  was non-dischargeable student loan debts; and

b)    $1,977.62 of net monthly income with $1,925 in total monthly expenses for a household of two. Hutchins reported $52.62 in monthly net income.

**10) <u>Gregory Ryan Baldock Chapter 7 case numbered 20-10158</u>**

On February 17, 2020 Mr. Baldock met with Harris to discuss filing for bankruptcy protection. On the same day, at approximately 9:17 AM CST, Harris and Mr. Baldock signed a Pre-Petition Agreement.  This agreement contemplated Mr. Baldock paying nothing to Harris for his pre-petition services while requiring Harris to advance the filing fee on behalf of his client. This pre-petition agreement also details Harris' total post-petition attorney's fee of $2,500, the terms of payment

for those fees post-petition ($48.08/weekly for 12 months ), and the legal services encompassed by the prospective post-petition representation.

On February 18, 2020, at approximately 16:43 EST, Harris filed for a Chapter 7 Skeletal Petition for Mr. Baldock.  Also, on February 18, 2020, at approximately 3:48 PM CST, Harris and Mr. Baldock signed the Post-Petition Service Agreement which contemplated Mr. Baldock compensating Harris $2,500 payable in weekly allotments of $48.08 for 52 weeks beginning February 28, 2020. In addition, Mr. Baldock  also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On March 3, 2020 Attorney Harris filed the remaining schedules and statements needed to complete Mr. Baldock's bankruptcy.  These documents reported in part:

a) $11,990 in total unsecured debt, and

b) $1,412.67 in net monthly income with total monthly household expenses of $1,370 for a household of three. Mr. Baldock reported that his resultant net monthly income was $42.67.

## 11)  Robert and Sheila Ray Chapter 7 case numbered 20-10211

On February 27, 2020 Mr. and Mrs. Ray met with Harris to discuss filing for bankruptcy protection.  On the same day, Harris and the Rays signed a Pre-Petition Agreement.  This agreement contemplated the Rays paying Harris nothing for his pre-petition services while requiring Harris to advance the filing fee on behalf of his clients. This agreement also details Harris' total post-petition attorney's fee of

$2,500, the terms of payment for those fees post-petition ($208.33/month), and the legal services w encompassed by the prospective post-petition representation. On March 2, 2020 at approximately 18:45 EST, Harris filed the Ray's Chapter 7 Skeletal Petition.  On that same day, at approximately 5:58 PM CST, Harris and the Rays entered a "Post-Filing Agreement." This Agreement called for the Rays to pay Harris $2,500 in 12 monthly installments of $208 beginning March 22, 2020. The Rays also executed a payment authorization form for the automatic withdrawal of the scheduled payments when due post-petition.

On March 11, 2020 Harris filed the remaining schedules and statement to complete the Rays Bankruptcy. These documents reported in part:

a)    $29,300.06 in total unsecured debt, and

b)    $2,727.79 in net monthly household income for a household of two with $2,796.33 in total monthly expenses. The Rays reported a resultant negative $68.54[5] in monthly net income.

## LAW

The Bankruptcy Code delineates the terms upon which attorneys who represent debtors may receive compensation. *See e.g.* 11 U.S.C. §§ 329, 330, 526; Fed. R. Bankr. P. 2016, 2017. In the Chapter 7 context, attorneys who represent debtors: (i) cannot receive compensation from the estate for their representation of the debtor[6]; (ii) cannot collect fees from their clients during the post-petition period if those fees arose from a pre-petition agreement[7]; and (iii) must charge reasonable

---

[5] This includes $208.33 in monthly payments to Fresh Start.
[6] *Lamie v. United States Tr.*, 540 U.S. 526, 536-37, 124 S. Ct. 1023, 1031 (2004)
[7] *Rittenhouse v. Eisen*, 404 F.3d 395, 397 (6th Cir. 2005)

fees for the services they render to their debtor clients[8]. Given these restrictions, attorneys generally charge, and collect, a flat fee for their services prior to filing a petition on behalf of their clients (the "<u>Standard Practice Fee</u>"). However, it is not an uncommon circumstance that a client is unable to pay the entire fee before a petition is filed, so some attorneys have begun crafting agreements that purport to "unbundle" or "bifurcate" their services into pre-, and post-, petition portions. The intent of such agreements is apparently at least in part, to avoid the effects of the automatic stay and the discharge injunction by allocating most of the attorney's services to the post-petition period, thereby allowing the attorney to collect their fees after the petition has been filed.

In general, courts have determined that bifurcated contracts in the Chapter 7 context are not *per se* prohibited. *See e.g. In re Milner,* 612 B.R. 415, 432 (Bankr. W.D. Okla. 2019); *In re Carr,* 613 B.R. 427, 442 (Bankr. E.D. KY 2020).  Instead, courts have assessed the facts of a given case, or set of cases, to determine the propriety of the fee, and service, splitting structure at issue. *See In re Carr*, 613 B.R. 427, 442 (Bankr. E.D. KY 2020)(stating "Not all multiple fee arrangements will pass muster. Different circumstances involving different debtors may require different processes or even render an arrangement like the one discussed herein an improper practice"); *Milner*, 612 B.R. at 433-443. A single test to assess the probity of such bifurcated agreements has yet to emerge from the various rulings on the issue. However, each of these courts have considered certain legal issues to determine the

---

[8] *Id.*

viability of the bifurcation structure at hand: (i) the sufficiency of the attorney's disclosures to the debtor and the court; (ii) whether the attorney's entire fee is reasonable; (iii) whether the bifurcated agreement is in the client's best interest; and (iv) whether the procedure used by the attorney to effectuate the bifurcated agreement was sufficient to establish a legally cognizable post-petition obligation of the debtor. The remainder of this brief will consider the cases at hand using each of these four broad elements.

## I. Sufficiency of Disclosures to the Debtors and the Court

### a. Disclosures to the Debtors

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 brought significant changes to the Bankruptcy Code in an attempt to stop fraudulent and abusive practices in the bankruptcy system. Among these changes, the BAPCPA created a new category of professional, the Debt Relief Agency, which included attorneys representing debtors, and instituted certain minimum standards of professional conduct for these professionals. As part of these minimum standards of professional conduct, Debt Relief Agencies are required to make certain disclosures to their debtor-clients pursuant to Sections 527 and 528. These disclosures, which must be in writing, cover issues such as the need for veracity in the completion of the debtor's schedules, the methodology of asset valuation that must be used in bankruptcy, and the possibility that the case could be audited.

Given the circumstances of these proceedings, the disclosures required by Section 528(a)(1) and (2) are the most pertinent to the questions before this Court.

In relevant part, Section 528 (a)(1) and (2) state the following:

> (a) A debt relief agency shall--
>
>> (1) not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously--
>>
>>> (A) the services such agency will provide to such assisted person; and
>>>
>>> (B) the fees or charges for such services, and the terms of payment.
>>
>> (2) provide the assisted person with a copy of the fully executed and completed contract

11 U.S.C. § 528(a)(1)-(2). In the simplest terms, Section 528(a)(1) and (2) require that prior to filing a petition for a debtor, a Debt Relief Agency must enter into a written contract with its debtor-client that delineates both the services it will provide and the cost of those services.

One bankruptcy court has recently reviewed similar agreements as the agreements presented in these eleven. That court found that the disclosures in the agreements to be insufficient. *See Milner*, 612 B.R at 435-437[9].

In the cases at hand, review of the Pre-Petition Contract and the Post-Petition Contract Harris used in these eleven cases reveals a lack of clarity and conspicuousness in the documents. The Pre-Petition Contract and the Post-Petition Contract contain largely the same provisions and problems including:

1) The Pre-Petition Fee Agreement while purporting to be limited in scope is anywhere from 6 to 8 pages long with convoluted lists that

---

[9] This matter is currently on appeal to the United States District Court for the Western District of Oklahoma, Case No. 20-00033.

detail, among other things, prepetition services to be provided, post-petition services to be provided, excluded services, and waivers of conflicts of interest. The document is lengthy, verbose, and fails to simply, and succinctly, describe the pre-petition services Harris will provide the client for a specific fee.

2) The pre-petition agreement includes many ambiguous terms such as "analyze the information", "due diligence" and "comply with the bankruptcy code and rules." Although these legal terms of art are imbued with meaning for bankruptcy attorneys, a lay person simply will not understand the actions these terms are meant to describe. As a consequence, the lay person client will have no idea what services Harris promises to provide under the agreement and, as such, whether or not he has provided them with the promised services.

3) Neither the Pre-Petition Contract nor the Post-Petition Contract contains all of the payment terms that a client is obligated to meet. For example, the Pre-Petition contract may contain the total sum owed, a basic time frame for each payment (e.g. weekly or monthly) and the amount of each installment payment. However, the total term of the payment obligation is not included and, instead, is described as "until paid in full." In addition, neither contract explains the effect on the client of a default on the post-petition payment obligation. Moreover, the contracts are often missing crucial information about the payment terms or contain contradictory or confusing terms. *See e.g. In re Ricky Baldwin & Lorie Baldwin*, case no. 20-10009 (the Pre-Petition Contract states that total contract amount is both $2500 and $2,400 while the Post-Petition contract indicates that the amount is $2,500).

4) The Pre-Petition and Post-Petition Agreements contain waivers of

actual and potential conflicts between Harris and his clients. The waiver portions of these contacts contain vague and contradictory explanations of the conflicts between Harris and his clients. There is no description in the waiver of any alternative course of conduct to alleviate the waivers other than proceeding with the bifurcated contract as proposed. As an example, these agreements describe the conflict arising out of Harris' financing arrangement with FSF in this manner: "if the Law Firm obtains financing from the Lender and collaterally assigns your payment obligations to the Lender, the Lender will advance funds under its line of credit to the Law Firm based on the amount of the payments you owe the Law Firm, which may place the Law Firm in conflict with you since the Firm expects to receive payments from you in order to pay the Lender." A lay person likely will not understand the term "collaterally assign" or how the relationship between themselves and Harris relates to that of Harris and FSF. Further, the waiver does not explain accurately that FSF, not Harris, will seek payment from the client after the signing of the Post-Petition agreement.

The effect of these vague and confusing elements is that Harris' bifurcated agreement is not "clear and conspicuous" as required by Section 528(a). The debtors likely did not truly understand the difference between the two contracts, the effect of FSF's financing on their bankruptcy relief, or the overall services that they could demand under the contracts. Although all of these issues are troublesome, the fact that the effect of default is not clearly explained to the debtors is a disabling defect. Default is a material term of any contract. Thus, an attorney must disclose the default terms to his/her client in order to provide a full understanding of the risks and benefits of the agreement.

In addition to jurisdiction granted by the Bankruptcy Code, this Court has the authority to assess the adequacy of the information that Harris communicated to the debtors through the bifurcation agreements under the Kentucky Rules of Professional Conduct. *See Altenhofen v. S. Star Cent. Gas Pipeline*, 2020 U.S. Dist. LEXIS 219070, at *3-4 (W.D. Ky. Nov. 23, 2020)(explaining that "[w]hether an attorney practicing before the federal courts has violated an ethical rule is a question of federal law. Attorneys that practice in this Court must follow the Standards of Professional Conduct as set forth in the Rules for Professional Conduct as adopted by the Kentucky Supreme Court"). In *Persels & Assocs., LLC v.Capital One Bank,* 481 S.W.3d 501 (Ky. 2016)*,* the Kentucky Supreme Court held that the unbundling of legal services is permissible provided that it is reasonable under the circumstances and the client provides informed consent in writing. *Persels & Assocs., LLC v. Capital One Bank,* 481 S.W.3d 501, 504 (Ky. 2016). In this instance, the deficiencies noted above related to the Pre-, and Post-, Petition Contracts also impact the ability of the client to provide informed consent under Kentucky law. In Kentucky, "informed consent" is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Ky. SCR 3.130(1.0)(e). As detailed above, these contracts do not clearly communicate information about: (i) the consequences of default on the client; the entirety of the relationship between Harris and FSF and its impact on the client; and (iii)  the payment terms of the

contract between Harris and the client. Absent this information in clear and concise form, standing alone, these contracts do not provide adequate information about the risks and alternatives of the bifurcated fee process.[10]

### b.  Sufficiency of the Attorney's Disclosures to the Court

The Bankruptcy Code and Federal Rules of Bankruptcy Procedure require that any attorney representing a debtor disclose the compensation that they have agreed to accept for such representation. *See* 11 U.S.C. § 329(a); FED. R. BANKR. P. 2016, 2017. This reporting requirement is effective beginning one year prior to the debtor filing a petition for relief and continues throughout the period that a case remains pending before the Court. *See* FED. R. BANKR. P. 2016, 2017. To comply with this reporting requirement the attorney for the debtor must file a statement within 14 days of the petition date which discloses the compensation they have agreed to accept and any agreement they have entered into to share compensation outside of their law firm. *See* Fed. R. Bankr. P. 2016(b).

In these cases, Harris' Forms 2030 are confusing and do not comply strictly with either the Bankruptcy Code or the Bankruptcy Rules. In many of Harris' Forms 2030 he indicated that the debtors had agreed to pay him "$0.00" in response to question one. In fact, the debtors had agreed to pay between $2,100 and $2,500 for Harris services.

In a two if the cases the disclosure confusingly state that the Debtor will pay $2,500 over 12 months, when a lesser sum is due from the Debtor and in one of these cases the disclosure states that nothing has been paid prior to the filing of the statement when the Debtor had in fact paid $580 to Harris while this same deficiency is carried over to the Debtors SOFA Question 16.

---

[10] The U.S. Trustee does not have sufficient information to determine the sufficiency of the information Harris communicated to the debtors at their in-person meetings. However, the contracts should contain sufficient information to provide the debtors with informed consent. In these cases, the contracts fail to meet this standard.

*See e.g. In re Sheila Joan Carlton and In re Stephen Allen Thomas case no. 20-10088 and 20-10207.*

Notwithstanding these two cases, generally Harris does disclose the entire fee, along with the bifurcation of the fee and existence of a financing arrangement with FSF, at paragraph seven of Form 2030.[11]  However, these disclosures are still incomplete in relation to both the financing agreement and Harris' fee. In relation to the financing agreement between Harris and FSF, the disclosures fail to mention: (i) FSF's portion of the fee and (ii) the existence and function of the Holdback Account. In relation to Harris' fee, the disclosures fail to explain that the entire $2,500 is not his attorney fee. Under the financing agreement Harris can receive a maximum of 75 percent of the $2,500, or $1,875, while the remaining funds, $625, are FSF's fees.[12] Both of these elements are essential to a fulsome disclosure of Harris entire fee arrangement and the failure to disclose them renders his compliance with Section 329 deficient.

## II.    The Reasonableness of Harris' fee

Pursuant to Section 329(b) a bankruptcy court has the power to review the fees charged by an attorney for a debtor to determine whether those fees were reasonable within the circumstances of the case. In relevant part, Section 329 states:

> **(b)** If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to--
>
> **(1)** the estate, if the property transferred--
>
>    **(A)** would have been property of the estate; or

---

[11]  It appears that in each of the cases Harris advanced each Debtor the filing fee, which was paid by Harris and then collected post-petition.  The implications of this advance have not yet been fully noted or discussed.

[12] It should be noted that this FSF may be owed additional fees in certain cases. For example, the payment authorization form contains a boilerplate statement at the bottom which

**(B)** was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

**(2)** the entity that made such payment.

11 U.S.C. § 329(b). In determining reasonableness of a bifurcated contract fee, courts have compared the Standard Practice Fee charged by an attorney to the fee they charged for the bifurcated model. *Milner* 612 B.R at 433. In comparing these two types of fees, the primary question is whether the debtor received sufficient value from the bifurcated contract model to justify the increased cost over the Standard Practice Fee.

In this case, the U.S. Trustee reviewed the Chapter 7 cases that Harris filed during the entirety of the 2019 calendar year to determine his average Standard Practice Fee. In completing this analysis, the U.S. Trustee removed from the group of cases reviewed any Chapter 13 cases and any Chapter 7 cases in which Harris used a bifurcated model. During this timeframe, Harris filed a total of 53 Chapter 7 cases on behalf of clients in the Western District of Kentucky and consistently charged a flat fee of $1,250 for his services. Harris' Forms 2030 indicate that he consistently excluded "[r]epresentation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding." *See e.g. In re Christopher James Pierce and Lisa Gail Pierce*, case no. 19-10051, Form 2030 ¶6. Given that this is the same exclusion Harris uses in his bifurcated contracts, it appears that he provided his Standard Practice Fee clients with the same services as his bifurcated fee clients but at a rate that was $950 cheaper. Without additional information, there are only two differences between the

bifurcated fee clients and the Standard Practice Fee clients: (i) the bifurcated fee clients were able to pay Harris over time after receiving bankruptcy relief; and (ii) there was no factoring involved in the Standard Practice Fee cases. Neither of these apparent differences justifies the significant increase in fees Harris has charged in these cases.

In the bifurcated contracts Harris indicates that part of the reason for the increased fee are the costs of the bifurcated contract process itself. However, there is no explanation in the contract about the reason the bifurcated contract increases the cost so significantly. Again, without additional information, it seems that the increase is due to the involvement of FSF and ensures: (i) FSF's profits from the factoring arrangement with Harris; and (ii) that sufficient sums will accumulate in Harris' Holdback Account to offset any defaults among his clients using the bifurcated contract process.[13] This justification  is insufficient to account for such a substantial increase. In effect, this fee increase provides a small benefit to the debtors – the ability to pay over-time – while providing Harris with the substantial benefit of a guaranteed fee. Harris did not provide the bifurcated fee contract debtors with any additional services in exchange for the substantial increase in fees they paid. In fact, a review of the Forms 2030 that Harris filed with the debtors' cases indicate that he provided, and excluded, the exact same services to both

---

[13] In the Contract between Harris and FSF, FSF retains 15% of the fee (the "Holdback Amount") from each client in a single escrow account (the "Holdback Account"). Thus, the Holdback Account is an insurance fund created by aggregating the Holdback Amount from across Harris' bifurcated contract clients' payments. The sole purpose for this fund, and the corresponding increase it represents in Harris' fee, is to protect Harris from ever having to pay FSF on his loan obligation. In other words, Harris' clients are directly repaying his loan from FSF while simultaneously also protecting Harris and FSF from the default of any single client.

Standard Fee Practice clients and bifurcated contract clients.

As noted herein above, this Court has the authority to analyze the fee structure used by Harris under the Kentucky Rules of Professional Conduct. Under the KRPC, an attorney is required by Rule 1.5 to charge a reasonable fee. SCR 3.130(1.5)(a). This Rule then provides a lodestar analysis to determine the reasonableness of an attorney's fee, which includes the following non-exclusive list of factors:

(1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2)  the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

(3)  the fee customarily charged in the locality for similar legal services.

(4)  the amount involved and the results obtained.

(5)  the time limitations imposed by the client or by the circumstances.

(6)  the nature and length of the professional relationship with the client.

(7)  the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)  whether the fee is fixed or contingent.

SCR 3.130(1.5)(a). As is the case with any lodestar analysis, the application of these factors, and the importance the Court places on each one, is driven by the facts of the case at hand. Here, there are eleven cases before the Court, so generalized statements that apply to each are difficult to make without some qualification. Nonetheless, based on the information available to the U.S. Trustee, none of these

cases appears particularly complex for a consumer Chapter 7 proceeding. As such, the additional fees Harris charges to his Bifurcated Fee clients is not related to the complexities of their cases. Furthermore, Harris' bifurcated fee is higher than the customary fee charged for Chapter 7 services in the Western District of Kentucky. The U.S. Trustee took a sampling of fees charges by attorneys in consumer Chapter 7 cases in all four divisions that comprise the Western District of Kentucky.[14] The primary result of this sampling was that the average fee charged by an attorney for the provision of consumer Chapter 7 representation was slightly less than $1,000. This average arose out of a range of fees from $900 to $1,600 for Chapter 7 representation. Harris' $2,500 fee charged in conjunction with FSF far exceeds the top portion of the range found in the U.S. Trustee's sampling.

## III.    The Best Interests of the Debtors

As part of an analysis of a bifurcated contract under Section 329, some courts have considered whether the bifurcation process served the best interests of the debtor. In *In re Milner*, 612 B.R. 415, 433 (Bankr. W.D. Okla. 2019), the court assessed the best interests of the debtor by considering her ability to afford the payments required by the bifurcated contract during the post-petition period. The debtor in *Milner* had expenses that exceeded her income by approximately $994 per month. In the face of a monthly deficit the *Milner* court concluded that the

---

[14] This sampling by the U.S. Trustee was not meant to be exhaustive. We analyzed the fees of five attorneys who represent consumer debtors in each district by reviewing two cases per attorney. This amounted to 10 total cases per district. The attorneys were selected because their practices concentrated on servicing the needs of consumer debtors. Given the sheer number of Chapter 7 cases filed in the Western District of Kentucky, a more comprehensive sampling was not feasible.

bifurcated contract was not in the debtor's best interests.

In these cases, all of the debtors have a post-petition monthly budget deficit once the payment to Harris and FSF is added to their expenses. The U.S. Trustee used the debtors' schedule I and J to conduct an analysis of their ability to afford the monthly payments to Harris and FSF. The debtors' post-petition budgets are as follows:

| Case # | Case Name[15] | Sch I Income | Sch J Expenses | Disposable Income | Contract Pmt. | Contract Total | Effect of Payment |
|--------|-----------|-----------|-------------|-----------|----------|----------|----------|
| 20-10158 | Baldock | 1,412.67 | 1,370.00 | 42.67 | 208.35[16] | 2,500.16 | (165.68) |
| 20-10009 | Baldwin | 2,490.47 | 2,445.00 | 45.47 | 208.33 | 2,499.96 | (162.86) |
| 20-10088 | Carlton | 1,592.00 | 1,580.00 | 12.00 | 175.00[17] | 2,100.00 | (163.00) |
| 20-10068 | Hadley | 3,319.33 | 3,268.00 | 51.33 | 208.33 | 2,499.96 | (157.00) |
| 20-30066 | Hutchins | 1,977.62 | 1,925.00 | 52.62 | 208.33[18] | 2,499.96 | (155.71) |
| 20-10225 | Janes | 1,345.50 | 1,289.00 | 56.50 | 208.33 | 2,499.96 | (151.83) |
| 20-10048 | Lawhorn | 5,015.84 | 4,895.88 | 119.96 | 208.33[19] | 2,499.96 | (88.37) |
| 20-10037 | Maddox | 2,202.68 | 2,703.51 | (500.83) | 208.33[20] | 2,499.96 | (709.16) |
| 20-10084 | Oilery | 3,055.67 | 2,960.00 | 95.67 | 208.33 | 2,499.96 | (112.66) |
| 20-10211 | Ray | 2,727.79 | 2,588.33 | 139.46 | 208.33 | 2,499.96 | (68.87) |
| 20-10207 | Thomas | 2,160.70 | 2,089.00 | 71.70 | 160.00 | 1,920.00 | (88.30) |

**Average    (183.95)**

As is apparent from the analysis above, once the payment to Harris is included in the post-petition budget of each of these debtors their expenses exceed their income. As such, for the one-year period following the filing of their Chapter 7 petitions, the

---

[15] The case names were shortened to the last names of the debtors to conserve space.

[16] The contract between Harris and Gregory Baldock requires Mr. Baldock to make 52 weekly payments of $48.08. The U.S. Trustee averaged these payments to $208.35 per month.

[17] The U.S. Trustee calculated Sheila Carlton's monthly contract payment based on the total amount of $2,100 and an assumed 12-month period.

[18] Heather Hutchins contract with Harris requires Ms. Hutchins to pay make 26 bi-weekly payments of $96.15 which averages to $208.33 per month.

[19] Jimmy Lawhorn's contract with Harris requires Mr. Lawhorn to pay make 26 bi-weekly payments of $96.15 which averages to $208.33 per month.

[20] Melissa Maddox's contract with Harris requires Ms. Maddox to pay make 26 bi-weekly payments of $96.15 which averages to $208.33 per month.

financial struggles of each of these debtors will continue despite having sought bankruptcy relief. Interestingly, all but one debtor has some amount of disposable income prior to the inclusion of the bifurcated contract payment. Given that the bifurcated contract will ensure that the debtors financial woes continue for at least one year after the filing, as a financial matter this arrangement does not seem to be in the debtors' collective best interests.

## IV.    **Procedural Issues with Harris Bifurcated Contract**

The bifurcated contracts in the cases at issue seem to present two general problematic procedural characteristics: (i) in all but one of the cases, Harris did not receive any compensation for  his pre-petition work on behalf of the debtors; and (ii) in eight of the eleven cases the debtors signed both the pre-, and post-, petition contracts on the same day. These issues render the bifurcated process defective and unreasonable.

In all but one of the cases that comprise this proceeding, Harris did not receive any compensation for his pre-petition work. This fact suggests two possibilities: (i) Harris' pre-petition work was *pro bono* and he never intended to receive any compensation for it; or (ii) Harris intended to receive the same amount of compensation from the bifurcated contract structure as he does from the Standard Fee Practice and, therefore, his pre-petition work would be compensated by post-petition payments. The bifurcated fee process should acknowledge the value of the pre-petition services rendered by the attorney. However, nothing prevents an attorney from waiving their pre-petition fee altogether as long as their intent is not

to charge sufficient sums on the post-petition portion to compensate themselves for the purportedly "free" pre-petition work. Accordingly, if Harris intended to provide his bifurcated fee clients with *pro bono* pre-petition services then it is reasonable to expect that his portion of the overall fee would be lower than his Standard Practice Fee. However, based on the U.S. Trustee's analysis of Harris' fees during the 2019 calendar year, he charged a Standard Practice Fee of $1,250. In comparison, Harris receives approximately $1,500 as an initial draw from his line of credit once FSF approves a client for inclusion in its factoring program.[21] Solely based on this initial draw, Harris is earning more from the bifurcated fee process than he did from his Standard Fee Practice clients. This increase in fees stands in stark contradiction to the idea that the initial work was free or *pro bono*.

Some courts have required a "cooling off period" between the filing of the petition and the debtor's assent to the second contract in bifurcated agreement structures. *See Walton v. Clark & Washington, P.C.,* 469 B.R. 383, 385 (Bankr. M.D. Fla. 2012); *Carr* 613 B.R. at 432. This "cooling off period" provides: (i) the debtor with time to consider his/her options regarding representation after filing the petition; and (ii) a temporal break between the pre-,and post-, petition contracts to emphasize the difference between the two for the debtor. In eight out of the 11 cases in this proceeding, Harris and his client signed both the pre-, and post-, petition contracts on the same day.   In these cases, the debtors did not have even a modicum of time

---

[21] At some later point, Harris may receive up to an additional 15 percent of the total $2,500 fee he charged for the bifurcated contract structure. Harris' receipt of this additional sum is conditioned on his client base has avoiding significant defaults in their payments to FSF.

to consider their options and determine whether the use of Harris' post-petition services was in fact their best interests. Instead, the entire purpose of the bifurcated contract in these cases seems to have been to ensure Harris' whole fee was paid in full and that the debtors agree to both contracts as soon as possible.

V.    Conclusion

The U.S. Trustee asserts that, given the totality of the circumstances of these cases, the bifurcated fee process employed by Harris, and instituted by FSF, is unreasonable. Harris and FSF significantly increased the total fee charged to Harris' clients with the sole benefit to the clients, over and above the general benefits provided by bankruptcy,  being the ability to pay the fee over the period of 12 months. Although there may be a need to offset the risk of default, Harris and FSF have increased the fees to Harris' clients well beyond the increment of any default risk profile. This significant increase is unreasonable without the provision of additional services.

Dated December 21. 2020.

Respectfully submitted,

Paul A. Randolph Acting
United States Trustee

By  /s/ Timothy E. Ruppel
Timothy E. Ruppel Trial Attorney


**CERTIFICATE OF SERVICE**

The Undersigned certifies that a copy of the foregoing was served electronically

upon the Debtor's counsel and all other parties who have entered their appearance electronically and a paper copy was also served upon those that have requested the same, all on December  21, 2020

/s/ Timothy E. Ruppel

United States Department of Justice
Office of the United States Trustee
601 West Broadway Suite 512
Louisville KY 40202
Telephone: (502) 582-600 (230)
 tim.ruppel@usdoj.gov