# UNITED STATES BANKRUPTCY COURT
## FOR THE
### WESTERN DISTRICT OF KENTUCKY

| | | | | |
|---|---|---|---|---|
| IN RE: | ) | | | |
| | ) | | | |
| RICKY BALDWIN and | ) | CASE NOS. | 20-10009(1)(7) | |
| LORIE JEAN BALDWIN | ) | | | |
| MELISSA ANN MADDOX | ) | | 20-10037(1)(7) | |
| JIMMY MICHAEL LAWHORN | ) | | 20-10048(1)(7) | |
| AARON DEON HADLEY and | ) | | 20-10068(1)(7) | |
| EMILY BELLE HADLEY | ) | | | |
| DARRELL WAYNE OLLERY and | ) | | 20-10084(1)(7) | |
| DONNA KAY OLLERY | ) | | | |
| SHEILA JOAN CARLTON | ) | | 20-10088(1)(7) | |
| GREGORY RYAN BULLOCK | ) | | 20-10158(1)(7) | |
| STEPHEN ALLEN THOMAS | ) | | 20-10207(1)(7) | |
| ROBERT LLOYD RAY and | ) | | 20-10211(1)(7) | |
| SHEILA LOIS RAY | ) | | | |
| MARILYN L. JANES | ) | | 20-10225(1)(7) | |
| HEATHER RENEE HUTCHINS | ) | | 20-30066(1)(7) | |
| Debtors | ) | | | |

## MOTION TO RECONSIDER OR SET ASIDE MEMORANDUM DECISION AND RELATED ORDERS AND TO ALLOW A RESPONSE AND A HEARING

Harris and Harris, PSC ("Harris"), counsel to the above-referenced chapter 7 debtors, by and through undersigned counsel, moves this Court pursuant to Fed. R. Bankr. P. 9023 and Fed. R. Civ. P. 59 or, in the alternative, pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b) to reconsider or set aside the Court's *sua sponte* "Memorandum—Opinion" (the "Decision") dated October 5, 2021 and entered with a companion Order in each of the above-captioned chapter 7 cases.  Harris respectfully suggests that he was not afforded a meaningful opportunity to make arguments or adduce evidence in his defense. Harris requests an opportunity, at a minimum, to: 1)

file a more formal response to the issues set forth in the Decision,[1] and 2) adduce evidence in a hearing.

## I.     INTRODUCTION

The fundamental requirements of procedural due process are notice and an opportunity to be heard. Harris has a property interest under state law in the contracts that he entered into with each of the debtors in the above-captioned cases. In addition, each of the issues addressed in the Decision are predicated on well-developed standards of proof that involve mixed questions of law and fact. As set forth below, Harris has not had a reasonable opportunity to argue his position nor to adduce relevant evidence on the issues that the Court purports already to have decided. Moreover, as Harris explains below, many of the conclusions that the Court announced in the Decision were reached without a fair and full presentation of the law. The Court should set aside the Decision or at the very least accord Harris an opportunity to respond to the issues raised in the Decision—including the opportunity to adduce evidence—before the Decision is considered final.

## II.     PROCEDURAL HISTORY

1.      On April 3, 2020, this Court issued orders to show cause in eleven of Harris's cases where he had bifurcated the engagements and used Fresh Start Funding ("FSF") (the "Show Cause Orders"). The Show Cause Orders directed Harris to "show cause for failure to disclose the post-petition balance at the time of the filing of the Disclosure of Compensation." The Show Cause Orders did not direct Harris to explain bifurcation or to justify his engagement structure or his

---

[1] Of necessity, Harris addresses herein the legal issues framed in the Decision to illustrate that there are bona fide issues that need to be addressed. The UST position is 37 pages long, and the Decision itself comprises 31 pages. The issues are multiple. This Motion endeavors simply to point out that the Court has not had the opportunity to consider arguments that would vindicate Harris's engagement structure. If the Court sets aside the Decision, Harris should be given a clear indication of the issues that will be adjudicated and a fulsome opportunity to engage on those issues.

relationship with FSF. The hearing originally was scheduled for May 21, 2020, and no advance deadline was set for filing anything.

2.      On May 7, 2020, the Court *sua sponte* continued the May 21st hearing to July 23, 2020. No further directions were given.

3.      On July 7, 2020, the Court again *sua sponte* rescheduled the hearing to July 29, 2020. Again, no directions or deadlines were given.

4.      On July 28, 2020, Harris filed a "Response to Orders to Show Cause" explaining that while he unintentionally failed to list the post-petition balance owing by each of the debtors in response to paragraph 1 of his Disclosure of Compensation, the narrative information provided in paragraph 7 of those Disclosures clearly noted the post-petition balance owed. Harris suggested to the Court that this satisfied his obligations under Section 329 and Rule 2016.

5.      On July 29, 2020, this Court held a telephonic hearing on the Show Cause Orders. During that hearing the Court expressed broader concerns than just the failure to list in the Disclosures of Compensation the post-petition balance of fees owing by each debtor (although this was the only issue formally raised in the Show Cause Orders). The Court discussed the possibility of convening a joint hearing with the three bankruptcy judges of the District as had been contemplated in a chapter 7 case involving attorney Julie O'Bryan earlier in the year. See In re Gividen, Case No. 19-33745 (January 28, 2020).[2] The Court also discussed requiring Harris to file certain documents and obtaining a position statement from the United States Trustee ("UST").

6.      Consistent with the colloquy at that hearing, on August 6, 2020, the Court issued an order directing Harris to file "all written agreements and/or contracts between counsel and the

---

[2] As the Court likely also recalls, attorney O'Bryan instead elected to withdraw a defense of the matter and voluntarily cancelled the fee agreement with the debtor after receiving communication directly from the Court's staff counsel, mooting further process in that case.

Debtors . . . including, but not limited to, the fee agreements . . . as well as, documents referenced in subparagraph (1) of paragraph (7) [of the Disclosure of Compensation] related to counsel's recourse line of credit with the 'third party lender' referenced therein." This filing was due within 10 days of the order. On August 17, 2020, Harris filed the required documents

7.      After some procedural back-and-forth concerning redaction and/or an order limiting public access to the filed documents, on September 3, 2020, the Court again issued a *sua sponte* order directing the UST to "file a memorandum regarding the U.S. Trustee's position regarding the ethical obligations of Debtors' attorneys under Chapter 7 with respect to the Freshstart [sic] Funding Contracts within 30 days" of Harris filing redacted copies of the previously filed documents. The order did not contemplate, direct, or even allow Harris an opportunity thereafter to respond to the UST brief. Importantly, to this point there was no written statement of the legal or ethical issues alleged to exist with regard to Harris's engagement structure, let alone a motion suggesting a particular form of relief sought against Harris.

8.      The UST thereafter requested more extensive document production from Harris and examinations of the debtors, and filed a motion asking the Court to continue the UST's briefing deadline from October 5th to November 30th to accommodate the requested discovery. This Court granted the motion and, as a result of it, clearly knew that consensual discovery was occurring, including examinations of the debtors.

9.      The UST subsequently sought and obtained two more continuances of the briefing deadline to accommodate the discovery and allow a reasonable time after its conclusion to develop a position and draft the position statement. Harris cooperated in every respect with this discovery and did not oppose any of the continuances. On December 21, 2020, the UST filed a lengthy memorandum opposing Harris's bifurcation practice and relationship with FSF and asking the

court to 1) cancel the fee agreements, and 2) "order Harris to return a portion of the fees to the debtors."

10.    Based on all of the foregoing, Harris anticipated having an opportunity to file a response and, based on the Court's statements at the July 29th hearing, that there would be a formal process culminating in an evidentiary hearing.

11.    About three weeks after the UST filed his brief (which three weeks included both the Christmas and New Year holidays), on January 13, 2021, the Court issued yet another *sua sponte* order directing Harris to obtain an opinion from the Kentucky Bar Association, and to include the UST's brief in the request. The order did not set a deadline for compliance. Harris and his counsel began working on the opinion request.

12.    On March 19, 2021, the UST filed a motion to set a deadline for compliance with the order to obtain an ethics opinion, which the court granted three days later without any opportunity for a response from Harris. The order gave Harris seven days to file the request for an opinion.

13.    Harris complied with the seven-day deadline to submit the request for an ethics opinion and, on March 29, 2021, filed a Notice of Compliance with the Court. Over the next handful of months, Harris's counsel reached out multiple times to the retired judge who chairs the Attorney Ethics Committee. Ultimately, the Committee (at its chair's recommendation) declined to take up the issue—in part because of his impression that this Court already had decided the issue based on language in the Court's January 1 order. Harris did not learn of this decision until June 27, 2021, as Judge Isaacs transposed digits in the zip code to which he addressed an earlier letter sent to Harris's counsel. On July 6, 2021, the court issued an order requiring a status report.

14. Even prior to the Court's order to file a status report, Harris conferred with the UST about the outcome of the opinion request and potential options for presenting testimony to the Court on the Kentucky Rules of Professional Conduct. The UST's counsel indicated that he was conferring with his client and did not yet have a position on the issue, but that a status conference with the Court was appropriate. On July 16, 2021 Harris filed a "Status Report."

15. Without any further communication or process, on October 15, 2021, the Court *sua sponte* issued the Decision and accompanying orders.

## III. FACTS

Because the Court has not established a factual record in these cases and has not allowed Harris to present any argument or evidence, the Decision contains misconceptions about Harris's bifurcation practice and his relationship with Fresh Start Funding ("FSF"). Harris asserts a right to present evidence in an evidentiary hearing, but in the interest of framing issues in this Motion, presents the following proffer of fact:

1. Harris's relationship with FSF is memorialized in a "Line of Credit and Accounts Receivable Management Agreement" and a related "Line of Credit Note" (the documents referred to by the Court as the "LOCARMA"). FSF is a financing and payment management company that works with consumer attorneys across the United States to help them offer payment terms to their clients. FSF's attorney clients include practitioners in family law, criminal defense, immigration, and a host of other consumer-law specialties, including consumer bankruptcy. In the world of consumer bankruptcy, FSF also provides attorneys with best-practice forms and know-how to bifurcate chapter 7 engagements in order to offer their chapter 7 clients post-petition payment terms. FSF's program for consumer bankruptcy attorneys consists of an integrated suite of services: asset-based, working-capital financing; payment management services; credit reporting

for clients making payments; know-how, forms and best-practices education; and a defense guaranty and indemnity in the event that the attorneys' bifurcation practice or relationship with FSF are called into question.

2.      The financing component of FSF's relationship is a recourse line of credit, secured by a collateral assignment of receivables as security for repayment.  FSF provides Counsel with a revolving line of credit that may be drawn against each time post-petition payment terms are extended to a chapter 7 client, so long as certain basic underwriting requirements are met. This financing assists Counsel with cash flow challenges that naturally arise by offering clients payment terms.

3.      Counsel is allowed to draw on the line of credit 75% of the amount of the post-petition fee associated with each submitted post-petition engagement. Of that amount, 65% is advanced immediately. Ten percent is credited to a "holdback account," which operates as a pooled risk fund for client payment delinquencies and defaults, thereby mitigating the risk that Counsel will be asked to come out of pocket to repay advances that have been made against accounts that are not fully paid by clients.[3] FSF's fee for the financing, payment management services, credit reporting, education and support, and defense guaranty and indemnity, is calculated as 25% of the value of the post-petition fee in each engagement for which Counsel elects to take a draw against the line of credit. Counsel is responsible to pay this fee (as well as to repay advances) regardless of whether clients pay their attorney fees.

---

[3] The Court characterizes the terms as being a 60% initial advance and 15% hold-back, but these terms have changed since Harris commenced his relationship with FSF.

4.      Counsel was provided with basic forms that FSF has vetted against the case law summarized below, and that FSF's outside ethics counsel has approved. These forms include the following:

- a template Pre-Filing Agreement;

- a template Post-Filing Agreement; and,

- a template Form B2030 Attorney Disclosure of Compensation.

5.      Counsel presents the option of a traditional prepaid engagement, or a bifurcated engagement to any client who expresses the need for a pay-over-time solution in the course of a robust consultation. The Pre-Filing Agreement explains the options for a traditional or bifurcated engagement, and Harris buttresses the written disclosures with verbal explanations—going so far as to encourage debtors to pay up front, if at all possible. If the debtor nonetheless elects a bifurcated engagement, Harris conducts robust diligence to satisfy his obligations under the Code and to protect the client's interests, but proceeds with a so-called "skeleton" or "short" filing of only the documents required under Fed. R. Bankr. P. 1007 to commence the case. After the petition is filed, the debtor signs a Post-Filing Agreement to memorialize the post-petition payment structure, which includes a payment authorization by which the client consents to Harris sharing minimal information with FSF and to FSF managing the payments that the debtor thereafter will make to Harris.

6.      Once Counsel enters into a bifurcated engagement with a chapter 7 client,[4] the Post-Filing Agreement, proof of the client's income, and proof of the bankruptcy filing are uploaded to

---

[4] The Court characterizes the transaction as though the debtor client enters into or otherwise executed the "LOCARMA," which is not true. Debtors sign engagement agreements with Harris, and Harris's financing and payment management relationship is memorialized in the so-called LOCARMA. Part of the Post-Filing Agreement that debtors sign includes a payment authorization

FSF through an online portal. Following a simple underwriting process, Counsel receives the requested advance, and credit to the holdback account. Pursuant to the Finance Agreement, Counsel appoints FSF as its agent for managing the payments from each client, which FSF collects electronically either through debit card or ACH transactions. Payments from the clients are applied to Counsel's indebtedness. Counsel's clients receive positive credit references by making their payments, providing an attractive opportunity for the clients to begin rehabilitating their credit immediately after filing bankruptcy. Counsel's financing and payment management relationship with FSF are disclosed clearly to clients in both the Pre-Filing and Post-Filing Agreements, and Harris buttresses this with additional explanation. Payments made by the clients are for earned fees and are not advance payment for future services.

7.      FSF contractually disclaims any right to influence Counsel's representation of the client or to receive attorney-client confidential information beyond the limited sharing of information minimally necessary to underwrite Counsel's advance, to take a lien against receivables, and to manage the client's payments, all of which is done with the client's consent.

8.      Using the Form B2030 template provided by FSF, Counsel robustly discloses to this Court in each bifurcated case 1) the fact that the engagement is bifurcated and a description of the separate agreements, 2) that Counsel has charged a higher fee for a bifurcated engagement, 3) that Counsel financed the case through FSF and the basic terms of that relationship.

---

by which they consent to FSF managing the payments that they agree to pay to Harris, but debtors do not otherwise enter into any contractual privity with FSF.

## IV.    LEGAL ARGUMENT

A. Procedural Due Process and Fundamental Notions of Fairness Require that Harris Be Given an Opportunity to Present Evidence and Argument to the Court before His Engagement Agreements Are Voided and Any Action is Taken to Force Disgorgement of His Fees.

While the specific requirements of procedural due process vary according to the context of a particular case, it is well accepted that—at a minimum—due process requires notice of the proposed action that the government intends to take against a person, and a meaningful opportunity to be heard in a hearing before an impartial tribunal. See, e.g., Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").

Even beyond the minimum requirements of due process, the various issues that the Court adjudicated in the Decision involve well-established standards of proof and determination, many if not most of which are mixed questions of law and fact. Among these are the adequacy of disclosure, informed consent, and the reasonableness of fees—all as more specifically explained below.

Harris was not given adequate notice of the alleged problems with his bifurcation practice or any meaningful chance to respond. The Court's original Show Cause Orders raised only the issue of Harris failing to list the post-petition fees owed by the debtors in response to question 1 on the form Disclosure of Compensation. While the Court expressed concerns generally about bifurcation and Harris's relationship with FSF at the hearing on July 29, 2021, that hearing did not result in any specific discussion or memorialization of the issues that the Court believed might exist with these arrangements, and at no point in time has there been a motion filed by any party

10

seeking relief. In fact, the only order that resulted from the hearing simply required Harris to file certain documents (his fee agreements with the debtors, and his finance agreement with FSF). That order did not specify the Court's concerns, let alone contemplate or allow for Harris to file any response.

Once Harris filed the documents, the Court then directed the UST to file a position statement but did not afford Harris an opportunity to respond. As the Court is aware from the motions filed by the UST to continue the deadline for filing a position statement, the parties cooperated in extensive discovery for a period of months. Just prior to the holidays at the end of 2020, the UST filed its position statement, laying out for the first time any alleged problems with Harris's bifurcation practice and his relationship with FSF. Shortly after the holidays, and without giving Harris an opportunity to respond to the UST's arguments, the Court issued its *sua sponte* order essentially concluding that Harris's practice violated the Bankruptcy Code and Kentucky Rules of Professional Conduct but also directing Harris to seek an ethics opinion. At this point, the Court had not received any briefing from Harris and, despite knowing that discovery had been conducted, the Court had not established *any* record of factual allegations upon which a decision could legally be rendered.

Following the news that the Kentucky State Bar had declined to issue an opinion, the Court issued a thirty-one page memorandum decision indicating that the conclusions therein were the product of "exhaustive analysis." For almost eighteen months of these proceedings, Harris was given no specific notice of the alleged defects in his bifurcation practice. At no point has Harris been given an opportunity to argue his position. At no point has any factual record been established in these cases. The Court relied upon documents never admitted into evidence and factual matters

asserted by the UST that have never been subject to proof. The process leading up to the Court's Decision is fatally defective.

B. <u>Harris Is Entitled to Relief from the Decision under the Bankruptcy Rules</u>.

It appears to Harris that the Decision is not a final, appealable judgement to the extent that it does not impose any specific remedy—for example, an order to disgorge fees. It also appears that the Court expects the UST to "take further action with respect to the cancelled fee agreement[s] consistent with the" Decision. <u>See</u> Orders issued in each case on or about October 5, 2021. Out of an abundance of caution, however, Harris seeks relief alternatively under Rules 9023 and 9024, the former of which concerns alterations of non-final judgments, and the latter of which concerns relief from a final judgment or order.

Under either Rule, Harris meets the standard for relief. A court "may alter or amend a judgment under Civil Rule 59(e) to correct a clear error of law; account for newly discovered evidence, or an intervening change in the controlling law; or otherwise prevent manifest injustice." <u>Heil V. Evanston Ins. Co.</u>, 690 F.3d 722, 728 (6th Cir. 2012) (<u>citing</u> <u>Gen-Corp. v. Am. Int'l Underwriters</u>, 178 F.3d 804, 834 (6th Cir. 1999) (finding that it was an abuse of discretion to deny relief under Rule 59(b) where the trial court upheld a punitive damages verdict without a proper predicate award of compensatory damages). In <u>Heil</u>, as here, the trial court failed to follow the law leading up to a verdict, and the Sixth Circuit found that the failure to grant a motion under Rule 59(e) to correct that mistake amounted to an abuse of discretion.

Similarly, Harris meets the standard for relief under Fed. R. Civ. P. 60(b)(4) made applicable here through Fed. R. Bankr. P. 9024, because "[a] judgment is void under Rule 60(b)(4) 'if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, *or if it acted in a manner inconsistent with due process of law*." <u>Antoine V. Atlas Turner, Inc.</u>, 66 F.3d 105, 108 (6th Cir. 1995) (<u>quoting</u> <u>In re Edwards</u>, 962 F.2d 641, 644 (7th Cir. 1992)) (emphasis added).

12

Under either standard, this Court should set aside the Decision and set in place a process that allows Harris to respond to the asserted legal issues and to participate in an evidentiary hearing to establish a factual record in these cases.

    C.   <u>Harris Has Bona Fide Arguments and Relevant Evidence to Present to the Court on the Issues Raised in the Decision</u>.

    1.   *The Bankruptcy Code and Kentucky Rules of Professional Conduct Do Not Prohibit a Debtor from Reimbursing Their Counsel When Counsel Advances a Filing Fee Post-Petition.*

The Court reached an erroneous legal conclusion without a factual record concerning the propriety of Harris being reimbursed by the debtors for advancing their filing fees. Rule SCR 3.130(1.8)(e)(1) of the Kentucky Rules of Professional Conduct does not prevent an attorney from advancing filing fees and other costs of litigation. It, in fact, provides exactly the opposite: "a *lawyer may advance court costs and expenses of litigation*, the repayment of which my be contingent on the outcome of the matter." (Emphasis added.) The Court's interpretation of this statement (like the error committed in the <u>Brown</u> decision[5]) reads this provision as allowing an attorney to advance costs *only in a contingent fee case*. That obviously is not correct, as it is accepted practice to advance many types of court fees, deposition costs, mailing costs and a host of other out-of-pocket expenses in and out of bankruptcy. Indeed, this interpretation would turn the entire world of attorney-client relationships (not just bankruptcy) on its head.

Moreover, the Court makes two, related errors in its analysis of the obligation being repaid. First, the Court interprets the language of Rule 1006 that the filing fee "accompany" the petition as making the filing fee a pre-petition obligation. The debtor's obligation to pay the filing fee is neither a pre-petition nor a post-petition obligation; it is due at the instant that the petition is filed. As the Court correctly notes, there are procedural vehicles for paying the filing fee well after the

---

[5] <u>In re Brown</u>, 2021 WL 2460973 at *18 (Bankr. S.D. Fla. June 16, 2021).

petition has been filed. If the filing fee were a pre-petition obligation, it would be subject to the stay and discharge (which obviously is not the case).

Likewise, the Court erred in focusing on the *debtor's* obligation to pay the filing fee. The obligation that Harris is reimbursed for is his *advancement* of the filing fee. If the Court had allowed Harris to adduce evidence, it would have been clear in each case that he advanced the filing fee *after* the petition had been filed. His right to be reimbursed for that advancement is, therefore, a post-petition obligation that is entirely appropriate to be reimbursed by the debtors post-petition.

Finally, the Court erroneously relies on Section 526(a)(4)'s prohibition on advising an attorney to "incur more debt in contemplation of such person filing a case under this title" to suggest that the debtors reimbursing Harris for his post-petition advancement of the filing fee is illegal. This interpretation of Section 526(a)(4) is directly contrary to the United States Supreme Court's interpretation of Section 526(a)(4) in Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229 (2010).

Section 526(a)(4) of the Bankruptcy Code contains two prohibitions: a "debt relief agency" may not advise an "assisted person" to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or representing a debtor in a case under this title. In Milavetz, the Supreme Court was called upon to determine whether the first of these two prohibitions was constitutional. The Eighth Circuit Court of Appeals had previously concluded that the prohibition was impermissibly overbroad and, thus, violated a law firm's right to commercial free speech. See id. In reaching a decision to overturn the Eight Circuit's decision, the Supreme Court gave the first clause of Section 526(a)(4) a narrow interpretation, and it is that interpretation that compels a

14

conclusion that Congress did not intend for the second clause to prevent attorneys from allowing their bankruptcy clients to pay fees on terms.

Examining the context and history of the provision, the Supreme Court concluded that regardless of how broad the language might appear, it "refers to a specific type of misconduct designed to manipulate the protections of the bankruptcy system," and that the section "prohibits a debt relief agency only from advising a debtor to incur more debt because the debtor is filing for bankruptcy, rather than for a valid purpose." To illustrate its intended meaning, the Supreme Court went on to note that "advice to incur more debt because of bankruptcy, as prohibited by §526(a)(4), will generally consist of advice to 'load up' on debt with the expectation of obtaining its discharge—i.e., conduct that is abusive per se." The Supreme Court then compared this interpretation to the established purposes of other provisions of the Code, for example, "preventing the discharge of debtors obtained by false pretenses and making debts for purchases of luxury goods or services presumptively nondischargeable." The Court's conclusion necessarily limited the proscription to advising someone to incur debt prior to the filing, where "the impetus of the debt is the expectation of filing for bankruptcy and obtaining the attendant relief."

Examining the second prohibition in Section 526(a)(4) through this lens inexorably leads to the conclusion that advancing a filing fee—and, more broadly, offering a debtor a bifurcated chapter 7 engagement and post-petition payment terms—does not violate the Code. First, offering post-petition payment terms for fees and costs does not involve the incurrence of debt in anticipation of filing, let alone the idea of "loading up" on debt with the expectation of discharge. Second, the Court was concerned with advice that "presents a substantial risk of injury both to debtors and creditors," such as the risk to the debtor of losing a discharge or the risk to creditors of failing to timely identify a debt that is "manipulatively incurred" causing creditors to suffer

15

harm "as a result of the discharge and the consequent dilution of the estate." Post-petition payment terms pose neither of these risks: the debtor is not at risk of losing a discharge, and creditors are not harmed because the obligation is neither discharged nor dilutes the estate. See also In re Carr, No. 19-20873 at 13 (Bankr. E.D. Ky. January 22, 2020) (holding that 526(a)(4) "does not prevent a debtor from paying their counsel's legal fees directly over time" based on the court's analysis of Milavetz).

In fact, post-petition payment structures for chapter 7 debtors provide the perfect contrast to the type of "debt" that the Milavetz court determined that Section 526(a)(4) prohibits attorneys from advising their clients to incur. Instead of diminishing the estate, post-petition fee payments preserve it; instead of threatening a discharge, they enhance it by ensuring access to counsel; instead of encouraging debtors to exhaust sources of cash to prepay an attorney—perhaps through debt—they liberate debtors from the burden of raising money at their moment of highest financial instability. In short, offering post-petition payment structures to chapter 7 debtors—including to pay their filing fee—does not implicate Section 526(a)(4), and instead serves a number of salutary purposes that benefit every constituency involved in bankruptcy.

2. *Harris's Bifurcation Practice and Relationship with FSF Do Not Violate the Bankruptcy Code, Bankruptcy Rules, Local Rules, or the Kentucky Rules of Professional Conduct.*

    a. Harris Has Not Violated the Bankruptcy Code, Bankruptcy Rules or Local Rules by Bifurcating these Debtors' Engagements.

In reaching its conclusion that the Bankruptcy Code and local rules prohibit bifurcation, the Court has adopted a fundamentally incorrect perspective on the duties of counsel. The Court maintains that the bifurcation structure is an "end run" around the discharge injunction by making it appear that pre-petition duties are the product of post-petition agreements. The Court posits that:

> Encouraging a client to sign the post petition contract on the premise that the lawyer will finish preparation of the requirement Bankruptcy filings, attend the Section

16

> 341 meeting(s) and provide advice regarding reaffirmations and attendance at any hearing thereon, is on its face, a violation of the discharge injunction of 11 U.S.C. § 524 since the lawyer owes these duties to their clients *once they file the Chapter 7 petition*, whether they have been paid or not.

Decision at 16 (emphasis added). But even the Court's own description reveals the truth of the matter: whatever duties the debtor or the attorney have to complete the case are triggered by the *filing of the petition*. They do not exist until the bankruptcy case has been filed. They are, thus, *post-petition duties*. There is no duty to file schedules, to attend 341 meetings, to deal with proposed reaffirmations, to defend adversary proceedings, to cooperate with trustees *until the case has been filed*. Although the Bankruptcy Code and Rules are clear about what debtors must thereafter do to complete the case, they are actually silent as to what an attorney's duties may be. But the local rules deal with this issue.[6]

By its plain terms, the local rule cited by this Court provides that if an attorney files a bankruptcy petition, they remain counsel of record for the entire case. The local rule thus reflects the construct explained above: once the attorney files a petition for a debtor, they have a duty to continue with the representation—at least until and unless relieved of this duty by the Court. Again, whatever duty that rule imposes only arises *after the petition is filed*. Moreover, though, this rule clearly is not absolute: Clients fail to cooperate in their representation, making continued representation impossible. Clients fire attorneys. Clients choose to hire different attorneys. Attorneys die, become incapacitated, or lose their licenses. Attorneys develop conflicts requiring withdrawal. The fact that in a bifurcated engagement the client may choose not to sign a post-petition engagement agreement is no different in character or result than the foregoing examples.

---

[6] The Court also implies that Counsel could not have satisfied the requirements of Section 707(b)(4)(c) to complete required diligence before filing a petition. <u>See</u> Decision at 18. But the question of whether and how Counsel addressed this requirement is inherently factual and specific to each case. Before this matter could be addressed, the Court would need to allow Harris to adduce evidence on this issue and establish a record.

In fact, the very next subsection of the local rule cited by the Court provides that an attorney may withdraw with the court's consent after notice and a hearing. <u>See</u> W.D. Ky. Local R. Bankr. P. 9011-1(a)(2) (providing that an attorney can be relieved of their duty after notice and a hearing upon motion and order); R. 2091-1 (providing notice requirement for withdrawal). Accordingly, a sensible parsing of the Code, the Rules and the Local Rules results in the following maxim: once an attorney files a petition for a debtor, they are professionally obligated to see the case through to completion *unless* relieved of this duty by the Court. Harris's engagement agreements disclose this to debtors.

But none of this actually is germane to the instant situation. Harris remained counsel of record in each of these chapter 7 cases and never purported or sought court permission to withdraw. From and after the time that he filed each of these debtors' petitions, he provided plenary and successful representation through each of the debtors obtaining their discharge. The situations presented in these cases do not implicate the local rule in any way, form or fashion.

The Court cites to the recent <u>Prophet</u> decision in support of its conclusion that the "bundled" nature of chapter 7 bankruptcy practice and the local rule prohibit bifurcation. The <u>Prophet</u> decision is not final and is, in fact, currently on appeal.[7] But the cases relied upon by the <u>Prophet</u> court in support of its conclusion actually illustrate quite nicely how these chapter 7 cases are pivotally distinguishable. In <u>In re Mungo</u>, for example, the court found that the attorney violated the predecessor to the Local Rule at issue here by failing to sign and file the pleadings and failing to represent the debtor at the hearing on the pleadings. <u>See</u> <u>In re Mungo</u>, 305 B.R. 762 (Bankr. D.S.C. 2003). In sharp contrast here, Harris has represented the debtors at every stage of

---

[7] <u>Benjamin R. Matthews & Assoc. v. United States Trustee (In re Prophet, et al.)</u>, Appeal No. 3:21-cv-01080-JMC (D. S.C.)

the bankruptcy process. The <u>Prophet</u> court's reliance on <u>In re Burgess</u> is similarly misplaced. There the court found that the local rule was violated by attorney's failure to represent the debtor in a motion for relief from stay and motion for reconsideration and sanctioned counsel for his failure. <u>See</u> <u>In re Burgess</u>, C/A No. 16-03815-JW, slip op. (Bankr. D.S.C. April 19, 2017). The <u>Prophet</u> court also mistakenly relied on <u>In re Stamper</u>, C/A No. 02-09812-W, slip op. (Bankr. D.S.C. Dec. 19, 2005). In <u>Stamper</u>, the court sanctioned the attorney for refusing to represent debtor in a motion to incur debt without advance payment, finding that the attorney violated the local rule. And finally, the <u>Prophet</u> court relied on <u>Johnson v. Bank of Travelers Rest (In re Johnson)</u>, C/A No. 02-12454-W, Adv. Pro. No. 03-80212-W (Bankr. D.S.C. May 8, 2003). <u>Johnson</u> was a Chapter 13 case where the attorney was forced to represent the debtor in an adversary proceeding because he failed to obtain a written fee agreement excluding adversary proceedings, which the court found violated the local rule. <u>Id.</u> Each of these cases involved situations where attorneys refused to provide required services or failed to use engagement agreements that allowed for excludable services, and the bankruptcy court enforced the local rule's mandate to remain counsel of record in all proceedings. That simply isn't the case in the matters before this Court. Even putting aside the Court's problematic use of a non-final decision that is on appeal, the authority relied upon in that still-contested decision is inapposite here.

It would seem that the Court's ruling is not predicated on the actual language of the local rule at all, and seems instead to rely on an inexplicable expansion of the Rule's plain language to prohibit the use of any engagement agreement that could hypothetically give rise to a situation in which an attorney could seek to withdraw from representing a debtor after the case has been filed. No explanation is given for how this expansive interpretation of the local rule is reached or why it

is appropriate. Moreover, as noted above, every engagement carries with it the possibility of an attorney seeking to withdraw before the case is completed.

An examination of the policy basis and compelling need for bifurcation, and a comparison of the policy basis for so-called "unbundling" rules only reinforce the conclusion that bifurcation does not offend the local rules. Although bifurcation divides the work in a chapter 7 case between two cases, this is not in an effort to limit the scope of the engagement, but instead to facilitate a plenary representation. This makes bifurcation and so-called "unbundling" rules entirely complementary. This Court should, accordingly, resolve any doubt about whether its own local rule prohibits bifurcation against there being conflict.

In a $0-down case, the client typically cannot pay anything up front, and the attorney waives their fee for the minimal work required to commence the bankruptcy case. That initial work typically includes consulting with the client, conducting thorough diligence of the clients' situation, advising as to options and, if a chapter 7 bankruptcy is appropriate for the client, preparing the minimum documents required under Fed. R. Bankr. P. 1007 to commence the case.

The attorney defers preparing the schedules and statements until after the case has been commenced as a way to balance the client's need for relief without paying up-front fees with the attorney's need to make the engagement economically feasible. Rule 1007 requires no justification for deferring preparation of the schedules and statements, and this type of balance is allowed under the Rules of Professional Conduct. See Ky. R. Prof. Conduct 3.130 (1.2(c)) and comments [6] and [7]).

And despite the need to structure a bifurcated engagement with separate pre- and post-petition agreements, and the consequent need to inform debtors that they are not obligated to execute a post-petition engagement agreement, the purpose of doing these things actually is to

facilitate a plenary representation.  So, while the bifurcated structure is legally binding and "real," the purpose and the actual effect is to promote debtors having the benefit of having representation throughout the entire case. This somewhat counterintuitive proposition (that you would technically limit or structure the representation in an effort to facilitate a plenary representation) has been acknowledged by the courts. The debtors in each of these cases testified that it was their intent from the beginning to have Harris represent them throughout their chapter 7 cases.

Local limited-scope representation rules are understood to exist in order to promote attorneys providing plenary representation to debtors. Because bifurcation serves the same policy purposes behind these rules that seek to restrict or prohibit limited scope representation, under well-accepted canons of statutory construction this Court should reconcile them compatibly.

For example, in Reves v. Ernst & Young, 494 U.S. 56 (1990), the United States Supreme Court had to define the phrase "any note" in the definition of "security" to determine whether a creatively structured financial instrument that was denominated a "note" was in fact a regulated security under the Securities and Exchange Act. Id. at 60-61. The Court approached the question from the perspective of Congressional purpose and intent.  The Court first observed that Congress had a very broad purpose in the Act, id. at 61, but then postulated that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Act." Id. at 63.  Although the Court ultimately concluded that the note under review was a security, it first parsed the language and its purpose to observe that not all notes are securities, even though the definition in the Act listed "all notes." See id. at 60-67. Reves is a case of "latent ambiguity" where apparently simple language could have been interpreted overbroadly, but for the Court's consideration of the

public policy behind the language, and a determination of whether a particular conclusion was sensible in view of the rule's intent.

The lesson from <u>Reves</u> is instructive here.  While a straightforward reading of the Local Rule does not suggest that it has anything to do with—let alone prohibit—bifurcation, any doubt about that must be resolved with reference to the purpose behind limited-scope representation or so-called "unbundling" rules.  On that score, the analysis in the <u>Hazlett</u> case is instructive.  In its discussion of whether bifurcation is legal, the <u>Hazlett</u> court first distinguished bifurcation from "unbundling" or using a limited services agreement. <u>Hazlett</u> at 14. Observing that the "primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process," the court noted in contrast that "the purpose of the bifurcated agreement is decidedly not to abandon the debtor, but to enable the attorney to be paid for the post-petition services." Id. (internal citations omitted). So, while under a bifurcated arrangement "debtors are given the option to proceed pro se," the "decision is solely up to the debtor, as the attorney is ready and willing to complete the representation upon the signing of the post-petition fee agreement." <u>Id.</u> "Thus," the court concluded, "the bifurcated fee agreement is not for unbundling" and "only increases the affordability of the attorney's services and thereby increases a debtor's access to legal representation." <u>Id.</u> at 14-15.

Even more specifically, the <u>Hazlett</u> court considered and rejected an argument that a bifurcated agreement was contrary to an even more specific similar local rule that flatly prohibited limited-scope representations and further provided that "[t]he scope of representation cannot be modified by agreement." <u>Hazlett</u> at 19 (quoting Bankr. D. Utah L.R. Bankr. P. 2091-1). The <u>Hazlett</u> court noted that:

> The intent of this rule is indeed to restrict the use of limited-service agreements (unbundling) by debtor's counsel. However, as noted above, the difference with

> Capstone's bifurcated agreement procedure is that the law firm is willing to complete the representation, and it is only by the debtor's election that the case proceeds pro se. Debtors are free at any time to terminate a lawyer's services, so the Court does not see the use of bifurcated fee agreements as creating the problem addressed by Local Rule 2091-1.

Id. This Court should reach the same conclusion.

The Slabbinck decision similarly concluded that limited-scope representation rules and bifurcation serve the same purposes. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012). The Slabbinck court considered a UST argument that the bifurcated engagement constituted impermissible "unbundling" of services in violation of the Michigan rules of professional conduct, concluding (after an exhaustive review of case law and the Michigan ethical rules) that a debtor could agree to split the engagement between two agreements with adequate disclosure. Id. at 583-89.  Summarizing its conclusion, the Slabbinck court noted:

> a pre-petition agreement to pay an attorney gives rise to a dischargeable debt. A post-petition agreement does not.  For the Court to insist on an all or nothing approach, in the name of promoting attorneys' competence, will have the perverse effect of depriving needy individual debtors who cannot afford to pay in advance for all of the legal services they may need in a Chapter 7 case, from hiring an attorney to provide them with any of the legal services that they may need in a Chapter 7 case.

Id. at 597. For the Slabbinck and Hazlett courts, finding that bifurcation violated "unbundling" rules would be akin to "throwing out the baby with the bath water." In a very similar situation, the Carr court noted that:

> attorneys appearing in bankruptcy cases before this Court may not withdraw from representing a debtor absent the Court's approval. [citation omitted] In this case, while the First Contract states that it will terminate upon the completion of the services the Attorneys agreed to provide thereunder, they did not move to withdraw from representing Debtor after they filed the Skeletal Chapter 7 Case. Because Debtor retained the Attorneys again post-petition and they did not attempt to withdraw from this case (with or without the Court's approval) before the Second Contract's execution, the Attorneys did not violate the local rule. The Court leaves for another day the issues that may be raised in other cases upon the post-petition filing of a Motion to Withdraw.

23

<u>Carr</u> at 15-16. It is precisely the same here. Nothing that happened in these cases implicated, let alone violated the local rule—let alone the Bankruptcy Code or Rules.

                      b.   <u>The considerable weight of authority and important policy concerns support the practice of bifurcation.</u>

Bifurcation serves compelling social and policy purposes. Debtors are languishing outside of bankruptcy longer than ever before and at great personal and societal costs. In a recently published article, the co-investigators of the Consumer Bankruptcy Project summarized these conclusions after a comprehensive review of the bankruptcy system. See "Life in the Sweatbox," Pamela Foohey, Robert M. Lawless, Katherine Porter & Deborah Thorne, 94 Notre Dame L. Rev. 219 (2018) (hereinafter, "Sweatbox"). Among their conclusions:

•     debtors wait longer than ever to file, despite crushing financial pressure, <u>id.</u> at 235;

•     debtors and, in particular, "long strugglers" who languish two years or more in financial distress before filing, arrive in bankruptcy with less assets and higher debts, <u>id.</u> at 239-41;

•     debtors (and, again, particularly "long strugglers") go without "medicine, food, utilities, car repairs, and paying the mortgage or rent" before filing, <u>id.</u> at 242-43;

•     this "[f]inancial misery hurts families," <u>id.</u> at 255;

•     "existing in a state of money scarcity damages people's ability to lead productive lives," <u>id.</u> at 257; and,

•     entering bankruptcy with higher debts and fewer assets hampers people's ability to truly obtain a fresh start, regardless of the discharge, <u>id.</u> at 259-60.

Once debtors make the difficult choice to file bankruptcy, the assistance of counsel becomes critical to their success. Pro se debtors have a far lower chance of achieving a discharge than those who have attorneys. Virtually all represented debtors obtain a discharge, but pro se

debtors have a several times higher likelihood of failing to achieve this fresh start. <u>See</u> Sweatbox at 229 n. 55; <u>see also</u> Angela K. Littwin, "The Affordability Paradox: How Consumer Bankruptcy's Greatest Weakness May Account for Its Surprising Success," 52 W. & Mary L. Rev. 1933, 1974 tbl. 3b (2011) (summarizing study results that represented chapter 7 debtors were nine times more likely to get a discharge than unrepresented debtors). Moreover:

> [t]he burden that pro se debtors place on the court system has been widely recognized. Judges, trustees, and court staff have detailed the extra time and system resources eaten up by aiding pro se debtors who are attempting to navigate the complexities of the bankruptcy process. Moreover, these efforts and resource expenditure are often for naught. The chance a pro se debtor's case will be dismissed because of a failure to comply with the dictates of the Bankruptcy Code and Rules is considerably higher than if the debtor were [sic] represented.

Lois R. Lupica & Nancy Rapoport, "Best Practices for Limited Services Representation in Consumer Bankruptcy Cases," Final Report of the ABI National Ethics Task Force at 50 (Amer. Bankr. Inst. April 21, 2013).

What, then, are the options for debtors who cannot afford to fully pay an attorney in advance to represent them in a chapter 7 case? In the recently released Final Report of the American Bankruptcy Institute's three-year Commission on Consumer Bankruptcy, four alternatives are discussed to the most preferable (but currently unavailable) option of having chapter 7 attorney's fees declared non-dischargeable by Congress: 1) "The attorney can delay filing a chapter 7 case until the debtor has paid up front all of the anticipated fees in the case," <u>id.</u> at 90; 2) "The attorney can file a chapter 7 case without receiving full payment of the anticipated fees, hoping that the debtor will voluntarily pay the fees from non-estate assets postpetition," <u>id.</u> at 91; 3) "The attorney can bifurcate the legal services to be provided, first entering into an agreement with a nominal fee covering only prepetition services and then entering into a postpetition agreement for the bulk of the fees to cover postpetition services" as to which, "[b]ecause it occurs postfiling and creates postfiling obligations, the automatic stay and the

bankruptcy discharge do not apply," id.; or 4) "The debtor can file the case under chapter 13 instead of chapter 7," id. Each of these options is perfectly legal but, among them, bifurcation best balances a debtor's needs for immediate relief and the assistance of counsel, and the attorney's need to be paid.

So-called "layaway plans" are not a good solution. Delaying bankruptcy prolongs a debtor's financial distress and exposes them to all of the negative effects summarized by the CPB investigators. Moreover, it puts a debtor in the counter-intuitive position of having to muster the cash to pay an attorney while all of the debtor's creditors continue to clamor for payment.

Expecting counsel to file a chapter 7 case with the mere hope of a voluntary, post-petition payment is completely untenable. Presumably, an attorney in this situation would be ethically obligated to explain to the debtor that the unpaid fees would be discharged in bankruptcy, leaving the attorney without a realistic hope of payment. Ultimately, this option makes the practice of chapter 7 debtor law inherently unattractive, all to the ultimate detriment of debtors and a system that works best when debtors have capable representation.

And, finally, placing debtors in chapter 13 solely to provide a means for attorneys to be paid is an ethically dubious practice, and clearly not in the best interest of debtors. "More than 95% of people who file under chapter 7 receive a discharge. In contrast, a mere 33% of chapter 13 cases end in a completed repayment plan such that debtors receive a discharge. Most chapter 13 bankruptcies end without debt forgiveness." Pamela Foohey, Robert M. Lawless, Katherine Porter & Deborah Thorne, "'No Money Down' Bankruptcy", 90 So. Calif. L. Rev. 1055, 1057 (2017) (footnotes omitted). Moreover, "[a]ttorneys charge an average of $1,229 to file and represent a debtor in a chapter 7 case and an average of $3,217 to file and represent a debtor in a chapter 13 case," id. at 1058 (footnotes omitted), meaning that this practice costs debtors

significantly more than simply filing a chapter 7.  In this District, the local rules allow a "no-look" Chapter 13 legal fee of $4,100.00. Paying more for a lower chance of success, and all just to provide a way for attorneys to get paid, is simply a bad idea.

Bifurcation of chapter 7 engagements is an increasingly common and accepted practice across the country. The history and legal support for the practice of bifurcation is extensive, and it is predicated on well-accepted principles of bankruptcy law. It has—quite literally—been accepted as "hornbook law" that a "debtor's attorney may be compensated for postpetition services from debtor's post-petition earnings." Collier Consumer Bankruptcy Guide, § 5.03[5][b].

Consequently, it is completely non-controversial for a person who files their own petition pro se to realize after filing that they would be better off with counsel, and to hire and pay an attorney to assist them in completing the case. Likewise, if a debtor fires their prepetition counsel, or that attorney becomes incapacitated or dies, no one would prevent the debtor from hiring and paying another attorney to complete the case.  Finally, even in traditional scenarios where a debtor pre-pays an attorney to represent them in their chapter 7 case, unforeseen events (like adversary proceedings, contested stay relief matters, etc.) sometimes arise and require the debtor to pay additional fees to their counsel from post-petition earnings. In each of these examples, the system recognizes two, key realities: 1) debtors are better off with counsel, and 2) attorneys need to be paid for their work. The only difference between each of these common situations and a bifurcated engagement is the timing of the client choosing the structure: bifurcation is a planned decision made with the client's informed consent at the outset of the engagement.

The 2019 Hazlett decision is one of the more comprehensive, thoughtful and recent analyses of the practice.  See In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019). Clifford White, the Director of the US Trustee Program, discussed that decision at some length in an August

2019 speech at the annual conference of the National Association Bankruptcy Trustees, describing the opinion as "well-reasoned," which led him to "commend" it to the USTP and the bar.

Notwithstanding the buzz generated by the Hazlett decision, though, the case law history of attorneys experimenting with different ways of offering post-petition payment terms to debtors goes back about 25 years. In 2003, the Seventh Circuit held that the fees from a single, prepetition engagement agreement are discharged if not paid before the filing, see Bethea v. Robert J. Adams & Associates, 352 F.3d 1125, 1129 (7th. Cir. 2003), but rejected the idea that their holding necessarily meant that a debtor would have to forego representation if the entire fee could not be prepaid, observing that "[t]hose who cannot prepay in full can tender a smaller retainer for prepetition work and later hire and pay counsel once the proceeding begins—for a lawyer's aid is helpful in prosecuting the case as well as in filing it." Id. at 1128.

The first two cases cementing the current practice of bifurcating chapter 7 engagements were decided in 2012. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012); Walton v. Clark & Washington, P.C., 469 B.R. 383 (Bankr. M.D. Fla. 2012). Since the Hazlett decision, the bankruptcy court in the Eastern District of Kentucky also has issued a published decision approving the practice of bifurcation, following closely the Hazlett rationale. See In re Carr, No. 19-20873 at 2 (Bankr. E.D. Ky. January 22, 2020). Finally, the bankruptcy court in the Southern District of Florida even more recently approved the practice of bifurcation noting that "[t]he UST specifically stated it is NOT, at this time, arguing that fee bifurcation in chapter 7 cases should be prohibited. *And that makes sense because fee bifurcation occurs regularly in chapter 7 cases*, as well as in other bankruptcy cases." In re Brown, Nos. 20-23632-BKC-LMI, 20-23354-BKC-LMI, and 20-18268-BKC-LMI, 2021 WL 2460973 at *7 (Bankr. S.D. Fla. Jun. 16, 2021) (italics added). The court approved a two-contract procedure, emphasizing disclosure to the debtor about the

choices that bifurcation presents. The <u>Brown</u> court also provided significant guidance on how the reasonableness of a post-petition fee should be determined, which is discussed below.

Understanding the plight of debtors and the legal history of bifurcation lends itself, in turn, to understanding why "skeletal" filings are common with the "$0-down" or "low-down" versions of bifurcated chapter 7 engagements.  To put it simply, minimizing pre-petition fees and deferring as much work as is legally and ethically permissible to the post-petition period (where the client can make affordable payments) allows Counsel to structure the engagement in a way that both addresses the client's distressed situation and results in an economically feasible transaction for Counsel. Fed. R. Bankr. P. 1007(c) allows the schedules and statements to be filed up to fourteen days after the petition date, and does not require any criteria be met to allow that. In short, there is no requirement that schedules and statements be filed with a petition, nor that any specific justification exist for taking advantage of the rule.

In a $0-down or low-down case, the client typically cannot pay anything significant up front, and the attorney waives most if not all of their fee for the minimal work required to commence the bankruptcy case. That initial work includes consulting with the client, conducting thorough diligence of the clients' situation, advising as to options and, if a chapter 7 bankruptcy is appropriate for the client, preparing the documents required under Fed. R. Bankr. P. 1007 to commence the case. Structuring the engagement to balance Counsel's and the client's interests is allowed under the Rules of Professional Conduct. See Ky. R. Prof. Cond. 3.130 (1.2(c) and comm. [5], [6], [7]).

    c.  <u>Harris Has Not Violated the Rules of Professional Conduct, and the Carr Decision Provides an Inarguable Basis to Conclude that Harris Acted in Good Faith in Believing that Bifurcation Is Consistent with the Kentucky Rules.</u>

The <u>Carr</u> decision completely vindicates Harris from any suggestion that his bifurcation practice violates the Kentucky Rules of Professional Conduct, and this Court should rescind any

suggestion to the contrary in the Decision.[8] The <u>Carr</u> court squarely considered whether bifurcation violates the Kentucky rules and concluded that it did not. <u>Carr</u> at 18-19. Even though no party—including the UST—suggested in <u>Carr</u> that the attorney's dual-contract process violated the Kentucky Rules, the Court took up the issue *sua sponte* and concluded that bifurcation is a legitimate form of limited-scope representation under the Kentucky rules. <u>Id.</u>

At the bare minimum, this Court should acknowledge that the application of Rule 3.130(1.2) requires determinations of reasonableness and informed consent, which are inherently factual matters requiring the consideration of each debtor's situation, and the totality of communication between Harris and his clients—matters that remain wholly undeveloped in these cases. In <u>Carr</u>, the Court recited the chronology and substance of the attorney's meetings and communications with the debtor, <u>see id.</u> at 19-20, carefully noting the ways in which the debtor was informed of and agreed to the form of the representation. To the extent that this Court remains unconvinced that the ethical requirements have been met, facts must be adduced before a conclusion can be reached.

And, finally, should this Court still be convinced that the practice of bifurcation violates the Kentucky Rules of Professional Conduct, it still should conclude that Harris has acted in good faith. Not only has the great weight of authority across the country concluded that bifurcation is ethically sound, *the issue has been previously decided here in the Commonwealth of Kentucky*. Ethical accusations have serious (even if unintended) effects, and there can be no question that the extant authority would have led any reasonable attorney to conclude that the practice Harris engaged in was ethically permissible.

---

[8] The separate issue of fee-sharing and Rule 5.4 are addressed separately below.

3. *The Question of Informed Consent, and Subsidiary Examination of Adequate Disclosure Are Factual Issues that Require Evidence that the Court Has Not Allowed Harris to Adduce.*

As the Court is aware, the debtors in most of these cases have been examined by the UST. Every single one testified that they understood the nature of the transaction into which they entered with Harris, including the option to prepay Harris's legal fee at a significantly lower amount. They also testified to understanding FSF's involvement in their agreement with Harris. This Court erred by looking solely to the documents (which have never been admitted into evidence) to determine whether the debtors exercised informed consent. This ignores a vital part of the transaction: namely, Harris's verbal explanations to the debtors of the arrangement, and their own testimony about what they understood. Such testimony is relevant on any finding on whether there was adequate disclosure to this client.

Informed consent is an inherently factual matter that requires an examination of the specific circumstances of communication between client and counsel.  See, e.g., CenTra, Inc. v. Estrin, 538 F.3d 402, 414 (6th Cir. 2008) (determining that a trial court erred in failing to allow testimony as to informed consent to waive a conflict); Moore v. Asente, 110 SW 3d 336, 354 (Ky. 2003) (upholding trial court's rejection of written informed consent document where parties testified differently as their understanding).

4. *Harris's Disclosures to the Court Exceeded the Applicable Standard.*

The Bankruptcy Code imposes a simple, straight-forward obligation on chapter 7 bankruptcy attorneys: "Any attorney representing a debtor . . . whether or not such attorney applies for compensation . . . shall file with the court a statement of the compensation paid or agreed to be paid . . . and the source of such compensation." 11 U.S.C. §329(a).  The purpose of the disclosure is to enable trustees and the court to assess the reasonableness of the fee charged. Section 329 is implemented through Rule 2016(b) of the Bankruptcy Rules of Procedure, which requires an

attorney to file "the statement required by §329," as well as "whether the attorney has shared or agreed to share the compensation with any other entity. . . . includ[ing] the particulars of any such sharing or agreement." Fed. R. Bankr. P. 2016(b).  The requirement to disclose fee-sharing relates not to Section 329 but, instead, to Section 504, which prohibits estate professionals (which a chapter 7 attorney is not) from sharing fees with other professionals who are required to be independently approved by the court under Sections 327 or 328 of the Bankruptcy Code.  Other than the requirement to disclose fee-sharing (not applicable in a chapter 7 case[9]), Rule 2016(b) does not add substantive disclosure requirements beyond Section 329's mandate.

Counsel's disclosure vastly exceeds the basic requirement of Section 329.  It describes the bifurcated nature of the engagement, accounts for pre- and post-petition fees, and describes his

---

[9] Section 4 of Form B2030 (the Director's Form created for Disclosure of Compensation) has become the focus of another argument in bifurcated cases where counsel uses a financing solution.  Because the typical financing structure results in the attorney only receiving a percentage of the debtor's post-petition fee, some argue that counsel are fee-sharing with the lender.  In terms of disclosure, those who make this argument contend that counsel must either check the box in section 4 denying fee-sharing, or check the box admitting it—either of which, they argue, is fatal.

First, this argument misunderstands the purpose of the fee-sharing disclosure in B2030.  This section of B2030 exists because Rule 2016(b) also implements §504, which provides that (with exceptions) "a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share . . . any such compensation or reimbursement with another person."  By limiting this prohibition to counsel subject to Section 503, chapter 7 attorneys are categorically excluded because their fees have no administrative status.  From this perspective, there is an argument that the disclosure is inapplicable to chapter 7 attorneys, or that checking "no" in response to the question is defensible, so long as that response is interpreted to mean "I am not out of compliance with §504."

Moreover, §504 has nothing whatsoever to do with the type of fee-sharing that is universally prohibited (i.e., sharing fees with non-lawyers).  Section 504 is more restrictive and prohibits fee-sharing among unassociated attorneys, even with the knowledge and consent of the client—an accepted practice outside of bankruptcy.  The purpose of the fee-sharing disclosure in B2030 is to police the requirements of §504, not to ask if counsel is engaging in a practice that is prohibited in all 50 states.  See Daniel E. Garrison, "There's No Such Thing as Too Much Information: Disclosure of Bifurcation and Financing in Chapter 7 Cases," ABI Journal, Vol. XXXVIII No. 7 at 68 (Amer. Bankr. Inst., July 2019).

financing relationship. While Counsel admittedly failed to list the post-petition fee in response to Question 1 on the form, the extensive narrative additions to the form did disclose the existence and amount of the post-petition fee. As noted above, the only requirements of Section 329 are a statement of the "compensation paid or agreed to be paid . . . and the source of such compensation" 11 U.S.C. § 329(a), and Counsel has expanded the required disclosures, and vastly exceeded the minimum standards, above which he should not be penalized. In sum, Counsel's disclosure to the Court meets all requirements.

     5. *Harris is Not Fee Sharing*.

The primary misunderstanding of FSF's relationship with attorneys like Harris is that by charging a fee calculated as a percentage of the legal fee, Harris is "fee sharing" in violation of SRC 3-130(5.4). But FSF provides a recourse line of credit, the repayment of which is secured by a collateral assignment of Harris's fee receivables, and the repayment of that debt is due from Harris whether his clients pay or not. This is not fee sharing; it is, instead, no different than a line of credit from a traditional bank that is secured by a firm's account receivables, and the law is settled that such financing arrangements are not prohibited.

One case widely cited in other cases reviewing financing and the Rules of Professional Conduct is PNC Bank, Del. v. Berg, No. 94C-09-208-WTQ (Del. Super. Ct. Jan. 21, 1997). In this case the court rejected the notion "that it is 'inappropriate' for a lender to have a security interest in an attorney's contract rights." The court noted that "it is routine practice for lenders to take security interests in the contract rights of other business enterprises," and said "there is no valid reason why a law firm should be treated differently than an accounting firm or a construction firm." The court acknowledged the potential applicability of Rule 5.4(a), but added:

> [T]here is no real "ethical" difference whether the security interest is in contract rights (fees not yet earned) or accounts receivable (fees earned) in so far as [Rule 5.4] is concerned. It does not seem to this Court that we can claim for our

profession, under the guise of ethics, an insulation from creditors to which others
are not entitled.

Taken literally, any obligation that a law firm pays from its operating account – including

employee salaries, insurance premiums, rent, and bar dues –is paid with legal fees, because that is

a law firm's source of revenue. As explained in footnote 9 of NYCBA Op. 2018-5:

> This opinion does not read Rule 5.4(a) to forbid funding arrangements in which the
> lawyer's debt obligation is secured by current or future accounts receivable but
> repayment is not contingent on the receipt or amount of fees. For example, a
> recourse debt that is not contingent on the amount of legal fees – e.g., a promise to
> repay a loan with interest over a particular period of time – does not constitute
> impermissible fee sharing simply because the debt is secured by accounts
> receivable in one or more matters. In the case of a recourse loan, there is no implicit
> or explicit understanding that the debt will be repaid only if legal fees are obtained
> in particular matters, and the creditor may seek repayment out of all of the law
> firm's assets. Nor do we believe the fee-sharing rule forbids funding arrangements
> in which the timing of the lawyer's payments is determined by the resolution of a
> matter – e.g., where the lawyer's payment obligation does not begin until a matter
> is resolved – but the amount of lawyer's payment obligation does not itself depend
> on whether, or in what amount, legal fees are obtained.

This is precisely the type of loan offered by FSF: Harris's firm must repay the line of credit

regardless of what he eventually receives in fees from his clients, and FSF's fee is not contingent

on Harris's recoveries. The mere fact that FSF effectively collects its fee from payment receipts

from Harris's clients does not change the analysis. For example, where a credit card company

deducts its fee directly from a client's payment of legal fees to an attorney, this Kentucky Ethics

Committee has concluded that such a practice is not fee-sharing in violation of 3-130(5.4). See

KBA E-426, see also ABA Committee on Ethics and Professional Responsibility, Formal Opinion

No. 484 (Nov. 2018) ("ABA Formal Opinion 484") (when finance company charges a financing

or subscription fee, it "is basically an administrative fee that is deducted from the payment to the

lawyer"); State Bar of Utah, Ethics Advisory Opinion Committee, Opinion No. 17-06 (Aug. 2018)

("Utah Op. 17-06") ("Sale or encumbrance of accounts receivable is not sharing fees with a non-

lawyer."); State Bar of Oregon, Formal Ethics Op. 2005-133 (Revised 2016) ("Oregon Op. 2005-

133") (prohibition on sharing fees "does not prohibit [a] [l]awyer from using a nonlawyer to collect legal fees, even when the nonlawyer is paid from collected fees").

Also, a Rule 3.130 (5.4)(a) analysis does not turn only on whether a discount or financing fee is paid out of the lawyer's legal fees in one or more cases. The purpose of Rule 5.4(a) is "to protect the lawyer's professional independence of judgment," not broadly prohibit lawyers from using them to pay for services that aid in their practice. For example, several jurisdictions have held that fee-financing arrangements that condition repayment of an advance or loan on either the recovery of fees or the recovery of a specific amount of fees violate the purpose of Rule 5.4(a) because the lender is given a stake in the outcome of the litigation that will incentivize it to try and influence the lawyer's independent judgment. See, e.g., New York Op. 2018-5, at 5–6; Maine Board of the Overseers of the Bar Professional Ethics Commission Opinion 193 (Dec. 2007); State Bar of Utah, Ethics Advisory Opinion Committee, Opinion No. 97-11 (Dec. 1997). Because the arrangement here was with recourse to the lawyer, "there is no implicit or explicit understanding that the debt will be repaid only if legal fees are obtained in particular matters, and the creditor may seek repayment out of all of the [lawyer's] assets." New York Op. 2018-5; see also State Bar of Nevada, Standing Committee on Ethics and Professional Responsibility, Formal Opinion No. 36 (Jan. 2007) ("Nevada Op. 36") ("Where a loan is not contingent on litigation success but is a conventional recourse loan that must be repaid irrespective of the outcome of the litigation it financed, courts and bar associations have generally approved such arrangements."). Therefore, the types of arrangements as in this case do not violate Rule 3.130 5.4(a), even if they require a lawyer to pay a portion of their fee to the lender for financing- and collection-related services.

Of course, the nature of Harris's relationship with FSF is a factual matter that the Court assumed to understand solely from looking at documents (that themselves have never been

admitted into evidence). The Court needs testimony to fully understand this relationship and to then, in turn, reconcile the true facts against the authorities cited above that Harris has never been given the chance to bring to the Court's attention.

6. *The Question of Whether Harris's Fees Are Reasonable Is a Factual Matter about which the Court Has Not Allowed Harris to Adduce Evidence and about which this Court Has Established No Record.*

This Court determined that Harris's fee was unreasonable without a factual record. As explained below, the appropriate standard for determining the reasonableness of Harris's fees requires an examination into the value of Harris's time, the amount of time that he spends on chapter 7 cases, and other similar factual issues. Harris can and will adduce evidence of the reasonableness of his fees.

Moreover, the primary concern of the Court seems to be with the fee differential between the prepaid and pay-over-time options. It is a common and completely defensible practice to charge differently for a traditional, prepaid chapter 7 engagement and a bifurcated, pay-over-time engagement. There are many reasons for this, including the fact that there are costs to use a financing and payment management solution like FSF. But there is an even more fundamental explanation of this dynamic: By insisting that financially distressed people prepay a substantial fee before they can obtain relief, and requiring attorneys to collect that fee in full before filing or risk discharge, chapter 7 attorney fees are highly commoditized and it is rare for an attorney using a traditional engagement structure to obtain a fee that compares in terms of the hourly value to other consumer work that they regularly perform. Consequently, prepaid chapter 7 services are highly commoditized, and attorneys are left to compete solely on price. Once these artificial market conditions are removed, and consumers are offered a pay-over-time option, they are happy (and able) to pay a more market-reasonable fee. Harris can provide competent testimony about

these dynamics and how his clients have reacted to having an option to pay over time. Moreover, the debtors testified as to these matters and that testimony has never been put before the Court.

And the option to instead file a chapter 13 case, particularly where there is no specific reason for needing to file a chapter 13, is not in the debtor's best interest. As noted above, chapter 13 is considerably more expensive than chapter 7, and the debtor's primary goal of obtaining a discharge is achieved only if the debtor is able consummate their plan over three to five years—with a statistically high probability of default. But Counsel's fees are protected in a chapter 13 and debtors may pay those fees over time, unfortunately leading many practitioners to favor their self-interest over the debtor's best-interest. Harris has considered these tensions and they inform his choice to offer a pay-over-time option—again, a matter for testimony.

Every time that a prospective client consults with Counsel, he is required to analyze the client's situation and advise whether chapter 7 or chapter 13 is better suited to the client's needs. Preparing the petition, schedules and statements is identical in chapter 7 and 13 cases. The first meeting of creditors likewise is identical. In fact, the only two differences in chapter 7 and 13 cases are the preparation and confirmation of the chapter 13 plan (which is largely a form document subject to well-understood expectations and provisions), and the fact that Counsel must remain ready to assist during the plan term if some need arises. Based on this comparison of the tasks, the idea that a chapter 13 case justifies a fee that is a multiple of the "typical" chapter 7 fee is simply unsupportable.

And this Court should not want to promote a system where attorneys have an economic incentive to prefer having clients file chapter 13 rather than chapter 7 cases. In chapter 13 cases, attorneys generally obtain higher fees and their fees are protected as administrative expenses. As noted above, however, chapter 13 is more expensive for clients, withholds their discharge for the

plan term, and carries a disturbingly high incidence of plan default—leaving the debtor no better (and in many cases worse) off than before filing. A number of investigators and commentators have noted the deleterious effect that this conflict has on clients, and particularly on people of color. See, e.g., Fee-Only Chapter 13, at *passim*; Paul Keil and Hannah Fresques, "How the Bankruptcy System is Failing Black Americans," https://features.propublica.org/bankruptcy-inequality/bankruptcy-failing-black-americans-debt-chapter-13/ (Pro Publica 2017).

Ultimately, however, the difference in the pricing of the two types of engagement is legally irrelevant. Reasonableness for purposes of Section 329 is determined with reference to the standard imposed by Section 330. See, e.g., Am. Law Ctr., PC v. Stanley (In re Jastrem), 253 F.3d 442, 443 (9th Cir. 2001) (invoking § 330(a)(3) in review of § 329(b) order). Under Section 330, the bankruptcy court must "consider the nature, the extent and the value of such services, taking into account all relevant factors," including a specific list of six considerations. 11 U.S.C. § 330(a)(3).

The Supreme Court has strongly embraced the lodestar standard for determining a reasonable attorney fee precisely because it "is readily administrable," "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." Perdue v. Kenny A., 559 U.S. 542, 130 S.Ct. 1662, 1672 (2010). To conduct a lodestar analysis, a trial judge must determine "the prevailing market rates in the relevant community," because the test was "[d]eveloped after the practice of hourly billing had become widespread." Id. The lodestar method thus produces an award that an "attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Id. These are inherently factual matters.

In the recent Brown decision in the Southern District of Florida, the bankruptcy court provided two very relevant pieces of guidance about how reasonableness should be determined in

a bifurcated chapter 7 case. First, the Brown court rejected the notion that the reasonableness of

the post-petition fee should be analyzed with reference to the attorney having charged $0 for pre-

petition services, noting that:

> The UST's argument falls short because it measures the reasonableness of the postpetition fee solely by comparing the charge to the fee for the services and charges prepetition. However, that is not the appropriate test. In re Carr, 613 B.R. 427 (Bankr. E.D. Ky. 2020), Judge Wise held that the reasonableness of the prepetition fees and the postpetition fees must be analyzed on the basis of the services provided with respect to each flat fee, not compared to each other. "[The Chapter 7 Trustee] assumes, in effect, that the Attorneys must charge Debtor a comparable hourly rate for prepetition and postpetition work. This is incorrect. The Attorneys essentially agreed to perform prepetition services for one flat rate and postpetition services for a second flat rate. No party has argued that either flat rate was unreasonable." In re Carr, 613 B.R. at 439. The Court agrees; reasonableness is not gauged by a comparison between the prepetition charges and the postpetition charges.

Brown, 2021 WL 2460973 at *9. Likewise, the reasonableness of a post-petition fee in a given

case is not judged by comparison to fees that may have been charged to other clients in completely

different cases. Attorneys regularly charge different fees in different situations. It is troubling, to

say the least, that the Court has relied solely on the UST to provide an analysis of fees charged in

different cases to reach its conclusion that Harris's fees are unreasonable. The UST is not a witness,

and nothing proffered by the UST has been tested let alone admitted into evidence.

The Brown court also rejected a UST argument that "reasonableness can only be assessed

by looking at the actual work performed, and the value of the actual services performed." Id. at *9.

Quoting from a Georgia case, the Brown court observed that "[b]ecause a flat fee encompasses all

required services and the extent of required services is not fully predictable at the outset of the

case, the reasonableness of a flat fee cannot necessarily be determined based on the amount of the

services required in the case." Id. at *10 (quoting In re Dabney, 417 B.R. 826, 831 (Bankr. N.D.

Ga. 2009)). Instead, the Brown court reasoned, it would "review the reasonableness of the

postpetition flat fee charged by each of the Law Firms by taking into account not only the work

that was done, but also the services that might have been required in the case for which there would have been no additional charge." Id. The only limitation on this consideration was that "the Court should not consider services that would not possibly arise in the case, such as dealing with student loan issues when the debtor does not have student loans." Id.

Applying these principles to the cases at bar, Counsel should be given the opportunity to testify as to i) his belief as to the reasonable hourly rate for his firm's services; 2) the amount of time typically spent on the mandatory work required in every case; and, 3) the amount of time typically spent on the potential work that can arise in any given case. This testimony can then be tied to the specific circumstances of each of these cases.

And despite the fact that reasonableness is not a function of comparison to other flat fees, there are quite rational reasons for Counsel to charge a different fee in bifurcated versus non-bifurcated cases. When Counsel offers a bifurcated, pay-over-time solution to debtors, he incurs significant costs and risks that he believes justify a higher fee than a traditional, prepaid engagement, and/or allow him legally and ethically to pass on some or all of those costs to debtors who choose that option. More specifically:

a.   Time Value of Money. Counsel extends payment terms to debtors for 12 months. He is aware that the average debtor that he serves—particularly after filing a chapter 7—could not obtain financing or, if they did, would likely pay an exorbitant interest rate for that financing.

b.   Payment Risk. Whether Counsel uses Fresh Start Funding or not, when he offers payment terms he takes the risk that his clients will not pay their agreed fees.  He has researched this issue and is aware that Clio, an international legal technology firm subscribed to by 150,000 legal professionals in 90 countries, publishes annual

statistics on how well attorneys in different practice areas do in collecting their fees. In both 2019 and 2020, Clio reported that bankruptcy attorneys collect, on average, 71% of their fees. If this level of default occurred in Counsel's cases, he would have to charge 140% of his normal, prepaid fee in order to come out even. While Fresh Start Funding does much better than this for Counsel with their payment management program, Counsel still bears the risk of these potential defaults with his recourse credit line with Fresh Start Funding.

c.    <u>Actual Financing Expense</u>. Fresh Start Funding charges Counsel 25% of the amount of his post-petition fees and costs in each case that he submit to take a draw on his line of credit.

In sum, the question of reasonableness is intensely factual in nature. Without a record in this case, the Court cannot properly reach a conclusion about Harris's fees. An evidentiary hearing is required.

## V.    CONCLUSION

Harris is entitled to due process and the benefit of the ordinary procedural protections offered under the law for presenting argument and adducing evidence in his defense. There are bona fide legal and factual matters interwoven into every issue addressed by the Court in its Decision. Under well-established standards of fundamental fairness, this Court should set aside the Decision pursuant to either Rule 9023 or 9024 and afford Harris the opportunity to present a fulsome defense.

RESPECTFULLY SUBMITTED this the 19th day of October, 2021.

41

/s/ Scott Bachert
Scott A. Bachert, Esq.
Kerrick Bachert, PSC
P.O. Box 9547
Bowling Green, KY 42101
Tel: (270) 782-8160
sbachert@kerricklaw.com


and


/s/ Michael Harris
Michael Harris, Esq.
Harris and Harris, PSC
204 Public Square
Columbia, KY 42728
Tel: (270) 384-2165
mikeharris@gmail.com


## CERTIFICATE OF MAILING

This is to certify, under penalty of perjury, that on October 19, 2021, the foregoing was electronically filed, and also emailed to those parties in interest set forth below.

Timothy E. Ruppel,
Office of the United States Trustee
tim.ruppel@usdoj.gov



/s/ Scott A. Bachert
SCOTT A. BACHERT